**OUTBOARD MARINE CORPORATION,**
a Delaware Corporation, Plaintiff,

v.

**PEZETEL, a Foreign Trade Organization of the People's Republic of Poland, Melex USA, Inc., a Delaware Corporation, Fern Clo Golf Car Co., Inc., a Pennsylvania Corporation, Ross Products, Inc., a Delaware Corporation, Eddietron, Inc., a North Carolina Corporation, and Boylan Leasing, Inc., a Michigan Corporation, Defendants.**

Civ. A. No. 77–51.

United States District Court,
D. Delaware.

Sept. 27, 1978.

William O. LaMotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff; Charles Owen Verrill, and Donald A. Lofty, Patton, Boggs & Blow, Washington, D. C., of counsel.

James T. McKinstry, Richards, Layton & Finger, Wilmington, Del., for defendants Pezetel and Melex, USA, Inc.; Henry W. Sawyer, III, Stewart Dalzell, and Mark M. Wilcox, Drinker, Biddle & Reath, Louis B. Schwartz, Philadelphia, Pa., of counsel.

William J. Wier, Bader, Dorsey & Krehstool, Wilmington, Del., for Boylan Leasing, Inc.; Thomas G. Buford, Howard & Howard, Kalamazoo, Mich., of counsel.

James T. McKinstry, Richards, Layton & Finger, Wilmington, Del., for Ross Products, Inc.; Gerald J. Brown, Cahill, Gordon & Reindel, Washington, D. C., of counsel.

Paul H. Spiller, Kimmel & Spiller, Wilmington, Del., for Fern Clo Golf Car, Inc; John C. Butera, Butera, Hess, Beausang & Moyer, King of Prussie, P.A. of counsel.

James T. McKinstry, Richards, Layton & Finger, Wilmington, Del., for Eddietron, Inc.; W. Warren Sparrow, Winston-Salem, N. C., of counsel.

MURRAY M. SCHWARTZ, District Judge.

The increase in trade between countries whose economies are controlled and the United States with its legal and economic heritage of free enterprise inevitably creates disputes not envisioned at the time statutes designed to promote the continued prosperity of the American economy were passed. When a producer in a controlled economy decides to manufacture a product solely for export to the United States, the potential for complaint from an aggrieved American industry increases.

This case demonstrates the difficulties which occur when an American manufacturer which cannot meet the prices offered by a foreign competitor operating in a controlled economy seeks refuge in the federal courts. The importation of electric golf carts from Poland and the subsequent demise of Cushman, a division of plaintiff Outboard Marine Corporation ("OMC") that manufactured gas and electric golf carts, gives rise to plaintiff's complaint, the subject of defendants' motions to dismiss.

Alleging antitrust claims under sections one and two of the Sherman Act, 15 U.S.C. §§ 1, 2, violations of the Wilson Tariff Act, 15 U.S.C. § 8, and the Antidumping Act of 1916, 15 U.S.C. § 72, OMC has named as defendants, Pezetel Foreign Trade Enterprise of the Aviation Industry ("Pezetel"), "an agency or instrumentality" created by and responsible to the Peoples Republic of

Poland, which exports golf carts manufactured in Poland to the United States under the brand name Melex; Melex, USA, Incorporated ("Melex"), a company wholly owned by Pezetel and incorporated in Delaware, which at the present time imports the golf carts and sells these carts in geographical areas of the United States which lack designated Melex dealers; Ross Products, Inc. ("Ross"), a Delaware corporation engaged in the distribution of Melex golf carts throughout certain southern and southwestern states of the United States; Fern Clo Golf Car Inc. ("Fern Clo"), a Pennsylvania corporation which distributes Melex golf carts in Delaware, New Jersey, New York,. New England and parts of Pennsylvania; Eddietron, Inc. ("Eddietron"), a North Carolina corporation which distributes Melex golf carts through North and South Carolina, Virginia, parts of Tennessee, West Virginia and Maryland; and Boylan Leasing Company, Incorporated ("Boylan"), a Michigan corporation designated to distribute Melex golf carts throughout certain midwestern states.

A reading of plaintiff's complaint illuminates the interesting history and marketing practices of the golf-cart industry. Until 1970 domestic manufacturers completely controlled the golf-cart industry without fear of competition from abroad. In contrast, Poland had very little interest in golf carts. Until 1970 golf carts had not been manufactured in Poland and until at least the time of filing of the instant complaint in 1977, and of oral argument in early 1978, no golf course existed nor were golf carts sold in Poland. In 1970, an American company known as Products International entered into an agreement with Pezetel's predecessor, Elektrim Foreign Trade Company for Electrical Equipment, Ltd. ("Elektrim"), to copy and manufacture an electric golf cart according to the specifications used by an American manufacturer. As a result, according to plaintiff, Elektrim pro-

vided eight carts "identical with and built to the specifications of the domestic vehicle."

The importation of eight such carts into the United States in 1970 hardly foreshad-. owed the phenomenal success awaiting the Polish manufacturer that could produce carts virtually identical in design to the American model at significantly reduced prices. In 1971, 959 electric golf carts were imported from Poland; in 1972, the number had increased to 2799. In 1973, defendant Pezetel succeeded Elektrim as the Polish manufacturer, established Melex, a wholly owned company incorporated in Delaware, and entered into exclusive sales and distribution agreements directly with defendant distributors Ross, Fern Clo, Eddietron and Boylan. The sales of Melex golf carts continued to rise at a rapid rate such that 6087 Melex carts were exported in 1973, representing 17% of all electric golf carts sold in the United States in that year. In 1974, 8040 or 19% of all electric golf carts sold in the United States were manufactured by Pezetel. Finally, within the first four months of 1975,[1] 4156 Melex carts were sold representing a very healthy 35% of the electric golf-cart market.[2]

Golf carts are typically sold by a manufacturer to a dealer who sells or leases to the ultimate consumer, usually a golf course, by way of a reverse auction. This process is initiated by the prospective purchaser who solicits bids. After the low bidder is identified, the other bidders have an opportunity to rebid until the buyer is satisfied it has secured the best terms, which usually means the lowest price. Here, the lower prices of Melex golf carts inevitably led to bids below those offered by OMC with the result that Pezetel's market share increased while OMC's sales declined. Finally, OMC discontinued production of both electric and gas golf carts at the end of 1975. Seeking damages incurred as a result of plaintiff's loss of sales, plain-

---

1. The complaint is silent as to the period since April 1975.

2. For purposes of the motion to dismiss, the relevant market is considered to be electric

carts. At a later stage in the proceedings, it may be necessary to consider the interchangeability of gas and electric golf carts to determine the relevant market.

tiff filed suit in 1977 alleging four counts of misconduct by defendants.

Count 1, alleging violation of Sherman 1, 15 U.S.C. § 1, asserts that Pezetel, Melex and the defendant distributors have by their sales agreements "combined and conspired among themselves . . . and have engaged in a course of action unreasonably to restrain interstate and foreign trade and commerce of the United States in golf carts." Count 2 sets out plaintiff's claim under Sherman 2, 15 U.S.C. § 2, claiming defendants and coconspirators have monopolized and are monopolizing or have attempted to monopolize . . . the manufacture, sale and distribution of golf carts in the United States. Count 3 alleges violation of Section 73 of the Wilson Tariff Act, 15 U.S.C. § 8, in that the alleged combination and conspiracy resulting in the importation of golf carts from Poland were intended by defendants and did "operate in restraint of lawful trade or free competition in lawful trade." Count 4 asserts that defendants which imported or have aided the importation and sale of electric golf carts in the United States at "prices substantially less than the actual market values of wholesale prices of such or similar products" in the United States at the time of exportation did so "with the intent of destroying or of restraining or monopolizing trade in golf cars" in violation of the Antidumping Act of 1916, 15 U.S.C. § 72.

The factual support for these allegations hinges upon two assertions: (1) the importation of golf carts manufactured by Pezetel at "agreed upon prices that are below 'actual market value' or alternatively that are less than fair value" and (2) the allocation of sales territories.

The allegedly offensive pricing scheme involves proffering prices to Melex dealers that are "significantly below the prices charged for comparable golf carts by domestic manufacturers to their dealers" such that the contracts negotiated with the Me-

lex distributors set a per unit price "less than the cost of production of most domestic golf carts." Thus, in connection with its claim that defendant sold below "actual market value" the complaint alleges not that Pezetel sold below its cost to its distributors, but rather that it undersold most of its American competitors' wholesale prices.

Sales at "less than fair value" is a term of art used by the United States Treasury Department and the United States International Trade Commission ("ITC"). In support of its claim that defendant sold at less than fair value, plaintiff relies on proceedings initiated before the ITC. The ITC is charged with investigating and correcting foreign trade practices that adversely affect domestic commerce. Apparently it found that the domestic golf-cart industry was substantially injured by defendants' activities and assessed increased duties against the defendant distributors, which also had served as importers. Consequently, in 1975 by agreement with defendant distributors, defendant Melex allegedly assumed the role of importer and as such paid the duty.

With respect to the alleged territorial restrictions, plaintiff avers that Pezetel allocated exclusive territories to defendants Ross, Fern Clo, Boylan and Eddietron.[3] According to plaintiff, each of these defendants "has exclusive rights to sell Melex golf carts in its assigned territory and each has agreed with Pezetel and with each other not to make sales outside its assigned territory."[4] Plaintiff further asserts that "it was either understood or expressly provided that the sale of Melex golf carts by any Defendant Distributor outside the assigned territory would result in termination of the agreement by Pezetel."[5] These dealership restrictions were allegedly continued by Melex after it became the importer of record in 1975.

---

3. The complaint is silent as to the distribution scheme throughout the rest of the country except for its reference to an unnamed California Melex dealer and to Melex's residual right to sell in territories without dealers.

4. Doc. 1 at ¶ 18.

5. Doc. 1 at ¶ 21.

Plaintiff asserts that by eliminating intrabrand competition in each territory, the dealer in that territory was assured substantial profits. It could underbid most domestic manufacturers and, without competition from other Melex dealers, maximize its own profits. As a consequence, Pezetel attracted "the best dealers and service organizations" and established "dealer loyalty to the Melex brand of golf carts" all to the detriment of plaintiff.

That OMC was gravely injured by defendants' presence in the market is undisputed. What remains at issue is whether the loss sustained by plaintiff is cognizable under the anti-trust or importation laws governing private rights of action. In moving to dismiss, all defendants maintain that plaintiff has failed to state a claim upon which relief can be based. In addition, defendants Boylan and Eddietron assert lack of personal jurisdiction. Pezetel also contests jurisdiction over it. Because Pezetel is allegedly an agency or instrumentality of a foreign state, its jurisdictional challenge is not of the garden variety; instead it gives rise to claims grounded in the international-law doctrines of sovereign immunity and act of state. This Court will evaluate these numerous contentions seriatim, disposing first of the jurisdictional questions before turning to the substantive issues.

## I. Jurisdiction Over Boylan and Eddietron

Distributors Boylan and Eddietron are incorporated in Michigan and North Carolina respectively where they each have been served pursuant to the extra territorial service provisions of the antitrust laws.[6] Recognizing that jurisdiction exists if well-laid venue is established, defendants assert that venue is fatally deficient because they neither reside in nor transact business in Delaware.

The applicable venue statute for private antitrust actions against corporate defendants is section 12 of the Clayton Act, 15 U.S.C. § 22, which provides:

"Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

A second venue statute applicable to private antitrust actions and relied upon by plaintiff is section 4 of the Clayton Act, 15 U.S.C. § 15, which provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

These sections are supplemented by the general venue statute of 28 U.S.C. § 1391 on which plaintiff also relies.[7]

It is not readily apparent how defendants Boylan and Eddietron come within the cited statutory provisions. Plaintiff, conceding at argument [8] that jurisdiction over Boylan and Eddietron is predicated exclusively upon the coconspirator theory of venue, asserts that "a conspirator is subject to suit in

---

**6.** 15 U.S.C. §§ 15, 22. The Antidumping Act is controlled by the service provisions of F.R. Civ.P. 4 instead of the broader extra territorial provisions available under the antitrust laws. Because of the disposition of the Action with respect to defendants Boylan and Eddietron, it is unnecessary to reach plaintiff's claim that notwithstanding the limited-service provisions of the Antidumping Act, jurisdiction attaches by reason of its pendent nature.

**7.** Plaintiff asserts venue under section 1391(b) which provides a forum in a district where "all defendants reside, or in which the claim arose" and section 1391(c) providing that a corporation may be sued where "it is incorporated or licensed to do business or is doing business." Section 1391(d) and 1391(f) deal with aliens and foreign states and thus have no colorable application to Boylan and Eddietron.

**8.** Doc. 42 at 74.

any district where his co-conspirators may be sued, on the grounds that all conspirators are agents for one another."[9] In support of this assertion, plaintiff has alleged that Melex, Ross and Fern Clo, all located within Delaware, acted on behalf of and as agents of Eddietron and Boylan. This proposition is remarkably similar to the one advanced in *Bankers Life and Casualty Co. v. Holland*, 346 U.S. 379, 74 S.Ct. 145, 98 L.Ed. 106 (1953), wherein plaintiff attempted to establish jurisdiction over a nonresident on the basis that all coconspirators act as each other's agent. In dictum, the court rejected the proposition that jurisdiction over one alleged conspirator establishes jurisdiction over all as a "frivolous albeit ingenious attempt to expand the [section 4 venue] statute." *Id.* at 384, 74 S.Ct. at 149.

Urging that the Court disregard this statement as mere dictum, plaintiff relies on *Giusti v. Pyrotechnic Industries, Inc.*, 156 F.2d 351 (9th Cir.), *cert. denied, Triumph Explosives, Inc. v. Giusti*, 329 U.S. 787, 67 S.Ct. 355, 91 L.Ed. 675 (1946), in which the Ninth Circuit purportedly adopted the coconspirator theory. In *Giusti*, the court held that the district court had jurisdiction over the defendant who, though absent at the time of suit, had actively engaged in business in California for many years. Upon termination of its business and pursuant to state statute, defendant filed a certificate consenting to service of process upon the Secretary of State concerning causes of action arising out of the business it formerly conducted in California. Upholding service upon the Secretary as valid under California law, the court also noted that other members of a conspiracy were agents of defendant and therefore defendant's presence in California was continued through the agents. Relying upon this statement as authority for its coconspirator theory, plaintiff overlooks that it also constitutes dictum.

Courts outside the Ninth Circuit that have considered the coconspirator theory under the antitrust laws have concluded that expanded jurisdiction of the sort plaintiff seeks is wholly unsupported by the venue statute. The Second Circuit in *Bertha Building Corp. v. National Theatres Corp.*, 248 F.2d 833 (2d Cir. 1957), *cert. denied*, 356 U.S. 936, 78 S.Ct. 777, 2 L.Ed.2d 811 (1958), adopted the reasoning of Judge McGohey in *Independent Productions Corp. v. Loew's, Inc.*, 148 F.Supp. 460 (S.D.N.Y.1957), who rejected the coconspirator theory and concluded that the admittedly liberal venue provisions in civil antitrust actions were intended by Congress to be considerably narrower than those permitted for criminal prosecutions under the antitrust laws. In the Third Circuit, rejection of the coconspirator theory as an unwarranted extension of the already liberal antitrust venue provisions is explicitly found in *Philadelphia Housing Authority v. American Radiator and Standard Sanitary Corp.*, 291 F.Supp. 252 (E.D.Pa.1968).[10]

■ *United States v. Scophony Corp.*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948), which predates *Bankers Life*, is no support for a contrary view. Analyzing the words "transacts business" of section 12, the court recognized that by this addition, Congress liberalized the venue requirement to reach defendants in districts where, viewed in practical terms, they carry on business of a substantial character. Because the *Scophony* court went to some pains to establish defendants' contacts in the forum, reliance upon it for support of the coconspirator theory is misplaced. Plaintiff's expansive views of the antitrust venue provisions, which go well beyond the rather detailed statutory language provided by Congress, will not be accepted.

■ At oral argument, plaintiff for the first time requested that the Court consider a change of venue for Eddietron and Boy-

---

9. Doc. 37 at 99.

10. This conclusion is supported by *Paramount Pictures, Inc. v. Rodney*, 186 F.2d 111 (3d Cir. 1951), where the court noted that, irrespective of the codefendants' presence in the forum, the question whether a given coconspirator was transacting business within the forum is an issue of fact resolvable only by oral testimony as to that defendant. *Id.* at 113 n.3.

lan to district courts in North Carolina and Michigan if the Court concluded that venue was improperly laid in the District of Delaware with respect to them. To cure defective venue, transfer may be effectuated under 28 U.S.C. § 1406 if the Court concludes that transfer rather than dismissal is in the interest of justice.[11] Transfer under this section is permissible even if the transferor court lacks personal jurisdiction over defendants. *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962). Thus, the issue is whether plaintiff has demonstrated that the interest of justice favors transfer.

 Generally, section 1406 motions are granted when plaintiff's cause of action is barred in one district by statute of limitations, *Mulcahy v. Guertler*, 416 F.Supp. 1083, 1086 (D.Mass.1976); *Goldlawr, supra*. That is not the situation in the instant case and although plaintiff asserts that refiling may affect his damages, that factor was within plaintiff's knowledge and control from the outset. In short, the Court is unconvinced that plaintiff has demonstrated that application of section 1406 is required to remove "obstacles" impeding "an expeditious and orderly adjudication of cases and controversies on their merits." *Goldlawr*, 369 U.S. at 466–67, 82 S.Ct. at 916.

Accordingly, defendants Boylan and Eddietron will be dismissed from this action for want of proper venue.

## II. *Jurisdiction over Pezetel*

Defendant Pezetel acknowledges receipt of proper service but asserts that the Court lacks personal jurisdiction over it and that claims against it are nonjusticiable. Defendant's jurisdictional argument is predicated on two postulates: (1) that it acted within its own territory and (2) that Pezetel is synonymous with the Peoples Republic of Poland.

Addressing the first postulate, defendant would interpret the complaint as alleging that since 1971 Pezetel acted in Poland's stead when it engaged in the manufacture and exportation of golf carts from Poland and because title passed to Melex or its predecessor Products International in Poland, the sale and distribution of these carts within the United States [12] was of no concern to Pezetel. Pezetel then reasons that (1) it has conducted no business within the United States and (2) the actions of Melex, its wholly owned American company, are not attributable to it under an agency or intraenterprise conspiracy theory. Because the Court cannot agree that the complaint fails to establish minimum contacts sufficient to give rise to jurisdiction, the question of jurisdiction over Pezetel can be resolved without consideration of Melex's relationship to it.

The complaint asserts that since 1971, Pezetel has exported electric golf carts to the United States, that Products International acted as an importer in 1971 and 1972 and that Melex, incorporated in Delaware in 1973, began to serve as importer in 1975 at the time additional duties were assessed by the Treasury Department. During the interim years 1973–75, Pezetel allegedly sold directly to the network of defendant distributors located throughout the United States, some of which are incorporated or do business in Delaware. In addition, it is alleged Pezetel negotiated agreements with defendant distributors that explicitly restricted their sales territories under pain of termination.

 A corporation is said to transact business in a district if from a practical viewpoint it carries on business of a substantial character, *Scophony, supra*, 333 U.S. at 807, 68 S.Ct. 855. When sales into a district are the basis of jurisdiction the test is "whether or not the sales would appear to

---

11. 28 U.S.C. § 1404 also provides a change of venue when the convenience of parties and witnesses and the interest of justice militate in favor of it. The record, however, is devoid of evidence necessary to evaluate convenience, *Aetna Casualty & Surety Co. v. Singer-General Precision, Inc.*, 323 F.Supp. 1141 (D.Del.1971), and thus transfer under this section is inappropriate.

12. Doc. 42 at 33–35.

be substantial from the average business-man's point of view." *Sunbury Wire Rope Manufacturing Co. v. United States Steel Corp.*, 129 F.Supp. 425, 427 (E.D.Pa.1955). In the instant case, sales and contracts mandating territorial restraints are alleged to have been initiated by Pezetel with .direct consequences in Delaware. On the basis of these representations, Pezetel is considered to have minimal contacts sufficient to create jurisdiction in Delaware.[13]

The bulk of defendant's jurisdictional argument goes not to the lack of contacts within the jurisdiction but rather to Pezetel's self-proclaimed status as a foreign sovereign nation. This exalted pronouncement provides the fulcrum for defendant's argument that it is immune from suit by reason of sovereign immunity. Its assertion that Pezetel is Poland is also central to its position that Pezetel is not a person within the meaning of the antitrust laws and to its argument that even if jurisdiction exists, the Court should decline to exercise it under the act-of-state doctrine.

### A. *Sovereign Immunity*

Because Pezetel's arguments regarding jurisdiction are predicated upon its status as a foreign state, it is important to recall precisely what is alleged. Pezetel is described as a "Foreign Trade Enterprise responsible to and a creature of the Ministry of Engineering Industry (also Machine Industries) of the Peoples Republic of Poland, and is an agency or instrumentality of that foreign state."[14]

The principles of sovereign immunity having root in international law establish the circumstances under which a foreign country or its agents are immune from suit. A foreign state or its agency or an instrumentality thereof is not absolutely immune from suit but rather immunity is "restricted to suits involving a foreign state's public acts (jure imperii) and does not extend to suits based on its commercial or private acts (jure gestionis)."[15] Codifying this "restricted theory of sovereign immunity" without intending to "affect the substantive law of liability"[16] the Foreign Sovereign Immunities Act of 1976[17] ("FSIA") provides in relevant part:

"Section 1605(a):

A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

. . . . .

(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with the commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with the commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a).

Commercial activity is defined in section 1603(d) of the Act as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d).

Despite the relatively straightforward language employed, defendant argues that the FSIA is not intended to reach antitrust claims raised by Pezetel's manufacture and sale of golf carts. Arguing that "a foreign

---

**13.** Because of the above conclusion, it is unnecessary to address the argument that jurisdiction would attach by reason of the "effects test" set out in *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945), whereby a foreign defendant who intends to affect and does affect commerce in the United States is made subject to the jurisdiction of its courts.

**14.** Doc. 1 at 2.

**15.** H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 7 (1976) *reprinted in* [1976] U.S.Code Cong. & Admin.News, pp. 6604, at 6605.

**16.** *Id.* at 12, reprinted in [1976] U.S.Code Cong. & Admin.News at 6610.

**17.** 28 U.S.C. § 1602 *et seq.*

state . . . shall not be liable for punitive damages" under section 1606 [18] of the Act, defendant Pezetel maintains that antitrust actions with their awards of treble damages are therefore expressly excluded. The difficulty with defendant's position is its convenient oversight of the words "except for an *agency or instrumentality*" in section 1606. That the addition of these words completely discredits defendant's position is evident from a reading of the full phrase "but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages." Thus, it is clear defendant Pezetel as an agency or instrumentality of the Polish government is subject to punitive damages in a proper case.

■ Defendant has also canvassed the legislative history attempting to establish that the language of section 1605(a)(2) which renders a foreign state subject to suit "in any case in which the action is based upon commercial activity" is limited to ordinary legal disputes based exclusively on tort or breach-of-contract claims as distinguished from antitrust violations. Because examples of each were offered at congressional hearings on the FSIA as justifying its enactment,[19] defendant asserts the FSIA is so limited. This position is wholly unconvincing for several reasons. In the first place, the language of the statute has no such qualifying language; rather the definition of commercial activity is broad and sweeping, belying the notion that Congress intended the limitation proposed by defendant. If there were any doubt about the breadth of the statutory language employed, the legislative history instructs that

"the courts would have a great deal of latitude in determining what is a 'commercial activity' for purposes of this bill. It has seemed unwise to attempt an excessively precise definition of this term, even if that were practicable. Activities such as foreign government's sale of a service or a product, its leasing of property, its borrowing of money, its employment or engagement of laborers . . . or its investment in a security of an American corporation, would be among those included within the definition." [20] Further, in addition to this language there is expressed recognition given to the Sherman Act in the legislative history where it is pointed out that the language of section 1603(e) is not intended "to alter the application of the Sherman Antitrust Act, 15 U.S.C. 1, *et seq.,* to any defendant." [21] It is concluded that where the antitrust laws would otherwise apply, their application was not intended to be limited by enactment of the FSIA. *See* Note, *Sherman Act Jurisdiction and the Acts of Foreign Sovereigns,* 77 Colum.L.Rev. 1247 (1977).

■ Pezetel next argues that the antitrust laws cannot apply to a foreign sovereign because they involve inquiry into the motives of that government and this may result in embarrassment and insult. But because breach-of-contract claims often involve a question of intent, this argument is not readily squared with defendant's position that contract claims are cognizable under the FSIA. Furthermore, the FSIA explicitly instructs that the test in determining whether the activity is commercial is the nature of that activity and not its purpose.[22] A review of the activity alleged in

---

18. The pertinent portion of 28 U.S.C. § 1606 provides:

"As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages; . . . ."

19. H.R.Rep. No. 94–1487, *supra* at 7, *reprinted in* [1976] U.S.Code Cong. & Admin.News at 6605.

20. *Id.* at 16, *reprinted in* [1976] U.S.Code Cong. & Admin.News at 6615.

21. *Id.* at 19, *reprinted in* [1976] U.S.Code Cong. & Admin.News at 6618.

22. 28 U.S.C. § 1603(d) provides:

"(d) A 'commercial activity' means either a regular course of commercial conduct or a

the complaint, i. e., involvement in the manufacture and sale of golf carts, admits of only one conclusion—that defendant Pezetel is engaged in commercial activity and as such is not immune from suit under the FSIA.

Pezetel raises one other obstacle to suit against it under the FSIA. Under the FSIA, actions against foreign states are deemed nonjury civil actions. 28 U.S.C. § 1330. Defendant contends that because plaintiff seeks a jury trial as to all defendants other than Pezetel, the action itself can no longer be considered nonjury and consequently jurisdiction over Pezetel is defeated. This overly technical reading has little to recommend it. As recognized by the legislative history to the FSIA, the statutory scheme set out in 28 U.S.C. § 1330 is analogous to that contained in 28 U.S.C. § 2402 which provides that actions against the United States be tried without a jury. The sovereign's right under either statute may be protected by a system of parallel trials whereby a judge determines the facts concerning the sovereign or its agencies and a jury is empaneled as factfinder with respect to the other defendants. This procedure, which has been accepted in actions against the United States, *see, e. g., City of Pittsburgh v. United States,* 359 F.2d 564 (3d Cir. 1966), readily disposes of defendant's argument without resort to further considerations.

### B. *Pezetel as a "Person" Under the Antitrust Laws*

Asserting that plaintiff's complaint necessarily calls for review of the actions of a foreign sovereign state, defendant would have the Court decide whether foreign nations are amenable to suit as persons under the antitrust laws. This question, however provocative, is not now before the Court. Pezetel's assertion that 15 U.S.C. § 7 [23] defining "person" under Sherman Act sections one through seven is inapplicable must be evaluated against the allegations of the complaint. But despite defendant's efforts to elevate Pezetel to the status of a foreign nation, there is nothing in the complaint to suggest that Pezetel is synonymous with Poland.

The complaint asserts that Pezetel is engaged "primarily in commercial activities common to private companies in economies that are not state-controlled." [24] This statement infers, at the least, that Pezetel is some type of undefined association existing under the laws of Poland for the purpose of conducting a business in a state-controlled economy. It does not follow that because a business in such a country has objectives and government ties alien to those of enterprises in a capitalist system that each such business is equal in stature to the government under which it operates. For that reason arguments based on cases such as *Pfizer, Inc. v. The Government of India,* 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978); and *New Mexico v. American Petrofina, Inc.,* 501 F.2d 363 (9th Cir. 1974), dealing with governments per se as "persons" under the antitrust laws are not particularly helpful in establishing whether a government-sponsored entity engaged in commerce is necessarily immune from the antitrust laws.

Another possible frame of reference is a body of case law dealing with claims of protected state action and occasionally immunizing from antitrust liability actions taken under the aegis of a sovereign state. [25] *Compare Parker v. Brown,* 317 U.S. 341, 63

particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."

23. 15 U.S.C. § 7 defines person as the following:

"The word 'person', or 'persons', whenever used in sections 1 to 7 of this title shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country."

24. Doc. 1 at 2.

25. The Court expressly leaves open whether it should be applied to an entity sponsored by a foreign government.

S.Ct. 307, 87 L.Ed. 315 (1943), *with Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). *See generally* Note, *Parker v. Brown Revisited: The State Action Doctrine after Goldfarb, Cantor and Bates,* 77 Colum.L.Rev. 898 (1977).

In *Parker,* the Court exempted California's marketing scheme regulating its raisin industry from antitrust liability "because upon a consideration of all the relevant facts and circumstances it appears that the matter is one which may appropriately be regulated in the interest of the safety, health and well-being of local communities . . . ." *Id.,* 317 U.S. at 362, 63 S.Ct. at 319. In *Goldfarb,* however, the Supreme Court subjected the Virginia State Bar minimum-fee schedule to antitrust scrutiny despite objection that its actions were those of the state and exempt under a state-action theory. In so ruling, the *Goldfarb* Court emphasized that the *Parker* state-action exemption is limited to conduct that is compelled and not merely prompted by the state acting as sovereign.

Assuming arguendo that Pezetel could at some later date demonstrate state action, its instant motion to dismiss on this basis is ill-founded and its contention that its conduct is *more like Parker* than *Goldfarb* in effect concedes the point. Only after the Court had carefully examined all the evidence in the *Parker* case did it conclude that the production and marketing of raisins presented a problem demanding state action for the economic protection of one of the state's important industries. In summary, to suggest that a motion to dismiss be based on *Parker* is to ignore *Parker's* procedural posture.

Defendant's motion to dismiss on grounds of state action finds no support in an antitrust law that expressly covers corporations organized under the laws of foreign states.[26] To accept defendant's position would involve redefining "person" or "persons" under the antitrust laws to include "corporations and associations existing under or authorized by . . . the laws of any foreign country *except those countries which control their economies.*" The Court declines to rewrite the statute. Defendant's motion to dismiss on a theory of state action is denied.[27]

## C. Act-of-State Doctrine

Defendant's argument based on the act-of-state doctrine is essentially a restatement of what was urged under the rubrics of sovereign immunity and state action. The contention is no more persuasive when advanced under the act-of-state doctrine.

The act-of-state doctrine "precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 401, 84 S.Ct. 923, 926, 11 L.Ed.2d 804 (1964). A litigant, in invoking the act-of-state doctrine under *Sabbatino,* must establish that what is involved is (1) a public act (2) committed by a recognized foreign power (3) exclusively within its own territory. As previously recited, defendant has established none of these.

Although rigid adherence to *Sabbatino* may not always accomplish the desirable goal of preventing unwarranted intrusion into foreign affairs, even the expansive interpretation of the doctrine supplied by the Second Circuit in *Hunt v. Mobil Oil Corp.,* 550 F.2d 68 (2d Cir. 1977), does not counsel abstention in the instant case. In *Hunt,* the court applied the doctrine in an action against private oil companies involving the nationalization of plaintiff's oil

---

**26.** 15 U.S.C. § 7.

**27.** In this regard it is interesting to note that since the famous Tate letter in 1952, the Department of State had urged abandonment of absolute immunity for foreign sovereigns because, among other reasons, trading companies in state-controlled economies received prefer-

ential treatment in American courts. *See Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, App. at 714, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1975). Now that Congress has effectively abandoned absolute immunity through passage of the FSIA, defendant would have this Court revitalize it.

fields in Libya because although Libya was not a defendant, the action required "judicial inquiry into the 'acts and conduct of Libyan officials, Libyan affairs and Libyan policies . . . and the underlying reasons for the Libyan government's actions'." 550 F.2d at 72. Although it is urged by defendants that Pezetel's manufacture and sale of Polish golf carts call into question Poland's foreign trade policies, the analogy to *Hunt* falls wide of the mark. *Hunt* like *Sabbatino* involved governmental expropriation of property contained within a sovereign's geographical limits. Because the *Hunt* court had no difficulty concluding that the act under review was a public act and not one where the "sovereign has descended to the level of entrepreneur," *id.* at 73, the case's relevance to commercial activity, *i. e.,* the manufacture and sale of goods in the United States by a foreign trading company, is at best remote.

Although *Hunt* does provide authority for the invocation of the act-of-state doctrine by private defendants under certain circumstances, Pezetel does not rely on it for this purpose. Rather Pezetel contends that it should be treated as a sovereign government. As previously recited, there is no basis in the present record to support that status for Pezetel. Rather, it is alleged that the defendant is a separate entity established for the purpose of trade. As such it is no different from the Turkish officer who sought immunity in an American court action involving the seizure of a commercial steamship owned by the Turkish government, The *"Gul Djemal,"* 264 U.S. 90, 44 S.Ct. 244, 68 L.Ed. 574 (1924), or those Cuban persons authorized by the Cuban government to seize and operate the cigar industry in Cuba who unsuccessfully raised the act-of-state doctrine. *Alfred Dunhill of London, Inc. v. Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976).

Under these circumstances, it is unnecessary to reach the question considered in *Dunhill, supra, i. e.,* whether commercial activity of a sovereign state falls outside the protective mantle of the act-of-state doctrine. Suffice it to say that should the question arise again, it would have to be evaluated in light of the FSIA which by its terms denies immunity to commercial acts of the sovereign.[28]

In conclusion, defendant's characterization of this litigation as "the spectacle of one nation's courts sitting in judgment of another nation's sovereign policies" to specifically measure "the legality of Polish economic and trade policies by the yardstick of American economic and trade policies" does not substantiate its act-of-state argument. The Court cannot agree that this action is the kind contemplated by Justice Harlan when he wrote "some aspects of international law touch much more sharply on national nerves than do others." *Sabbatino, supra,* 376 U.S. at 428, 84 S.Ct. at 940. The sale of goods within the United States is not perceived as impinging on the political system of Poland. Even if Poland were directly involved, any political embarrassment appears highly remote since there can be no genuine insult to sovereignty when a foreign enterprise undertaking to do business in a given market place is subject to the nondiscriminatory laws of that market place. Consequently, the Court concludes that jurisdiction over Pezetel is well founded and application of the act-of-state doctrine unwarranted.[29]

**28.** At the time of *Dunhill,* the FSIA had not been passed. Nonetheless, four Justices concluded that when a foreign sovereign engages in purely commercial activity, it cannot be heard to invoke the act-of-state doctrine. Another Justice found it unnecessary to address the issue. Justice Marshall writing for the dissenters noted that the restrictive theory of immunity later embodied in the FSIA was not the law. Assuming that it were, he detailed differences between the principles of sovereign immunity and act-of-state. Now that Congress has acted, one would have to consider the judicially created doctrine of act-of-state in light of the congressional enactment of the FSIA.

**29.** To bolster its act-of-state argument, defendant cites *Interamerican Refining Corp. v. Texaco Maracaibo, Inc.,* 307 F.Supp. 1291 (D.Del. 1970), a case where a foreign corporation successfully invoked the doctrine of *sovereign compulsion.* The instant complaint alleges that an American corporation approached Pezetel's predecessor and invited it to participate in the American golf-cart market which it did appar-

To summarize the jurisdictional section, the action with respect to defendants Boylan and Eddietron is dismissed on all counts for lack of jurisdiction. Because jurisdiction is well founded as to the remaining defendants, attention is turned to the merits of plaintiff's allegations.

 Before turning to the specific claims that are the subject of the motions to dismiss, it is useful to review the factual allegations against each of those defendants over whom the Court has jurisdiction, bearing in mind that on a motion to dismiss, all inferences are construed in favor of the nonmovant and that the complaint should not be dismissed "unless it appears to a certainty that the plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Scott v. Plante*, 532 F.2d 939, 945 (3d Cir. 1976).

It appears from the complaint that since 1973 defendant Pezetel has been engaged in the manufacture of golf carts for exportation to the United States under the brand name Melex and that during the years 1973–75, Pezetel sold Melex golf carts directly to its distributors under contracts mandating territorial restrictions. Pezetel's wholly owned company, defendant Melex, incorporated in 1973, has been the importer of record since 1975 and as such has superceded Pezetel as the seller of Melex carts to defendant distributors. Allegedly, Melex sells the golf carts under the same territorial restrictions earlier employed by Pezetel. It also retains residual selling rights in certain geographical areas. Since 1973, defendants Ross and Fern Clo are claimed to have been the exclusive distributors of Melex golf carts in their respective locations, having first entered into a sales contract with Pezetel and in 1975, having renegotiated essentially the same sales contract with Melex. Plaintiff OMC as a producer of golf

carts may be considered a direct competitor of Pezetel and as a seller of golf carts to its own network of dealers, a direct competitor of Melex. OMC's dealers competed directly with defendant distributors.

III. *Allegations Under Sherman Act § 1*

 Section 1 of the Sherman Act provides in pertinent part:

"Every contract,. combination in the form of trusts or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." [30]

By its assertions that each defendant distributor "has agreed with Pezetel and with each other not to make sales outside of its assigned territory" [31] and that "it was either understood or expressly provided that the sale of MELEX golf carts by any Defendant Distributor outside the assigned territory would result in termination of the agreement by PEZETEL," [32] and that since 1975, Melex as importer of record has continued these agreements in effect, plaintiff has alleged the concerted activity essential to a § 1 claim. *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226–27, 59 S.Ct. 467, 83 L.Ed. 610 (1939). Defendants, however, urge that plaintiff has failed to allege facts which would support the § 1 claim and in any case that plaintiff lacks standing to pursue a § 1 claim.

 One who brings private damage actions to enforce the criminal penalties of Sherman Act § 1 must demonstrate that conduct forbidden by § 1 has resulted in injury to his business or property. *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 262, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972). In short, there must be a causal nexus between the prohibited conduct and the asserted injury. The two forms of conduct complained of under Sherman Act § 1 are defendants'

---

ently with the support of the Polish government. These activities were allegedly continued by defendant. There is no assertion here of compulsion by anyone. If there were, evaluation of the defense whose purpose it is to avoid international tension would take place in light of the particular factual setting and, there-

fore, would necessarily survive a motion to dismiss.

**30.** 15 U.S.C. § 1.

**31.** Doc. 1 at ¶ 18.

**32.** *Id.* ¶ 21.

reduced prices and defendants' distribution scheme. Taking each of these in turn, it is necessary to ascertain with respect to each assertion whether the conduct is prohibited and, if prohibited, whether plaintiff is injured.

### A. Predatory Pricing

Plaintiff alleges that defendants have engaged in predatory pricing, an antitrust violation generally manifested by selling below one's own cost for the purpose of effectuating long term domination of the market. See, e. g., Standard Oil Co. v. United States, 221 U.S. 1, 43, 31 S.Ct. 502, 55 L.Ed. 619 (1910); United States v. Socony-Vacuum Oil Co., Inc., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); Utah Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967).

The measure of cost is variously interpreted by courts, see, e. g., Pacific Engineering & Production Co. of Nevada v. Kerr-McGee Corp., 551 F.2d 790, 797 (10th Cir. 1977); Hanson v. Shell Oil Co., 541 F.2d 1352, 1358 (9th Cir. 1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977), and has been the subject of several economic models, Areeda & Turner, Predatory Pricing and Related Practices Under Section 2 of the Sherman Act, 88 Harv.L. Rev. 697 (1975). Williamson, Predatory Pricing: A Strategic and Welfare Analysis, 87 Yale L.J. 284 (1977); Areeda & Turner, Williamson on Predatory Pricing, 87 Yale L.J. 1337 (1978). For purposes of this case, it is sufficient to note that predatory pricing of the sort with which antitrust laws are concerned necessarily involves selling at unremunerative prices. Therein lies plaintiff's difficulty.

■ Plaintiffs do not allege that the prices charged by Pezetel, although described as predatory and unfair, are less than Pezetel's manufacturing cost, however determined, but merely that they are "less than the cost of production of most domestic golf carts."[33] Notably absent are allegations that the prices are below cost or

that any of the defendants are foregoing a profit. Thus the complaint appears to place plaintiff among that group of "unhappy rivals [who] automatically assume predation when a competitor's price is below their cost, disregarding the possibility that the alleged predator's cost is well below theirs and more than covered by his price." Areeda, supra, 88 Harv.L.Rev. at 698.

Because Pezetel is government subsidized, its prices are not effectively measured under a cost-based analysis. Plaintiff meets this difficulty with the argument that the below-cost standard is appropriate only in a free market and urges that the Court devise a different measure of predatory pricing applicable to foreign commerce subsidized by state-controlled economies. This proposal, made without benefit of legal or economic analysis, leaves much to be desired. Whatever threat subsidized foreign commerce may pose to its American counterpart, plaintiff's argument calls for a perversion of both the judicial function and the antitrust laws.

■ It is the function of the courts to interpret existing law—not to usurp Congress by providing protectionist legislation for American businessmen when the latter perceive a need. The oft repeated phrase of Brown Shoe Co. v. United States, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), that the antitrust laws protect competition, not competitors, operates with force here. The antitrust laws were not intended as a sanctuary for those who cannot compete against lower prices be they the result of simple efficiency, economies of scale, cheap labor, technological expertise or anything other than commercially mischievous conduct. Thus, although plaintiff is injured by defendant's capability to offer lower prices as a result of foreign government subsidies to manufacturer Pezetel, the Court concludes that the antitrust laws do not provide a remedy for such loss.

### B. Territorial Restraints

Plaintiff has also attacked defendants' method of distribution as an unlawful re-

---

**33.** Doc. 1 at ¶ 19.

straint violative of § 1. Under the defendants' distribution scheme, each of the named defendant distributors is said to have exclusive rights to sell Melex golf carts within its assigned territory. In addition, it is alleged that all distributors have agreed with the manufacturer and among themselves, under threat of termination, not to sell outside the assigned territory. The plaintiff argues that the alleged agreement between the manufacturer and the distributors gives rise to a vertical restraint. To the extent a market allocation among the distributors is claimed, however, a horizontal territorial restraint arguably also is alleged.

 Because vertical restraints frequently serve useful business purposes that do not run afoul of the antitrust laws, the Supreme Court has ruled that such non-price restraints are no longer per se violations of § 1 but rather subject to a rule of reason. *Continental T.V. Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In contrast, the use of horizontal territorial restraints, even when interbrand competition is unaffected or even stimulated, is still governed by the *per se* rule of illegality found in *United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).[34] In light of *Sylvania* and *Topco,* it will be assumed for the purpose of deciding this motion that the form of territorial restraint alleged here constitutes prohibited conduct.

 In addition to showing a violation, however, plaintiff must demonstrate that it is injured by the offensive conduct. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In *Brunswick,* the Supreme Court considered the circumstances under which a private cause of action would lie under § 7 of the Clayton Act. Because § 7 prohibits mergers that may substantially lessen competition, there had been some question of

what actual injury a plaintiff must incur to prevail on a § 7 claim. Reasoning that to require a showing of actual loss of competition would subject every § 7 claim to the more stringent requirements of § 1 or § 2 of the Sherman Act, the lower court held that "injury in fact causally related to the violator's presence in the market" is compensable. 523 F.2d 262, 273 (3d Cir. 1976). Reversing this ruling as "authoriz[ing] damages for losses which are of no concern to the antitrust laws," 429 U.S. at 487, 97 S.Ct. at 697, the Supreme Court held that more is required to state a claim under § 7 than injury causally related to an illegal presence in the market.

In *Brunswick, supra,* the plaintiff complained that the defendant's acquisition of smaller failing firms lessened competition under § 7 and at the same time harmed the plaintiff by keeping competitors in the market that otherwise would have dropped out. The Supreme Court ruled that the injury of which the plaintiff complained—profits lost to thriving competitors—was not one which the antitrust laws are designed to remedy. Justice Marshall, writing for the *Brunswick* court, stated:

> "Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* at 489, 97 S.Ct. at 697 (emphasis in original).

The *Brunswick* standard applies equally well in a nonacquisition context. Here, plaintiff must demonstrate injury flowing from territorial restraints violative of § 1. In the absence of an agreement among defendants not to distribute outside their territory, *i. e.,* not to compete with each other, presumably there would have been intrabrand competition among defendant distributors so that several bids for Melex golf carts would have been submitted to

---

**34.** Although some question the disparate treatment accorded vertical and horizontal restraints, *see* L. Sullivan, *Handbook of the Laws of Antitrust* 425–26 (1977); Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division,* 75 Yale L.J. 373, 391 (1966); Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977,* 77 Colum.L.Rev. 979, 987 (1977), the *Sylvania* Court reaffirmed its position that horizontal restraints are subject to stricter scrutiny. 433 U.S. at 58 n.28, 97 S.Ct. 2549.

each prospective purchaser. ·Under these circumstances, however, prices would have been driven lower than under the existing system of territorial restraints and theoretically OMC would have found it more difficult to compete with Pezetel, not easier.

Plaintiff agrees that the use of territorial restraints alone would not have injured it but urges that when used in conjunction with lower prices, the restraints were fatal to it. Price competition among Melex dealers, plaintiff argues, would create reduced service capability and ultimately some Melex dealers would be forced out of the market. Since presumably this would occur at the hands of other Melex dealers, thereby causing the consolidation of which plaintiff now complains, plaintiff is at a loss to explain how it would be benefited by an increase in intrabrand competition or is injured by its absence.

Plaintiff propounds a more sophisticated variation of this argument at ¶ 23 of the complaint:

"23. Defendant PEZETEL also benefitted from the "accordion advantage" given to the MELEX distributors as a result of the combination of dumping prices and territorial restraints. These factors led to the stabilization of prices for MELEX cars at levels just below the ·minimum break-even level of competitive cars and such stabilization maximized MELEX distributor profits. This enabled PEZETEL to build a strong dealer network and also permitted the MELEX dealers to establish strong service organizations. The availability and quality of service is, and at all times material to the complaint was, an important factor in golf car sales and because MELEX distributors realized substantial profits at price levels that domestic dealers could not match, such MELEX distributors were positioned to attract additional sales which benefitted PEZETEL. Also, PEZETEL was, because of the profit maximization potential that was the result of less than fair value prices and territorial restraints, afforded the opportunity to attract the best dealers and service organi-

zations and to establish dealer loyalty to the MELEX brand of golf cars. Such advantages did, and were intended to, increase the sales of PEZETEL golf cars in the United States."

The Court is somewhat at a loss to discern the precise theory put forward with respect to service, since the service argument received scant attention at oral argument and virtually none in the briefs. It may be that plaintiff means that competition among Melex dealers would cause a decline in prices (of which, as already stressed, it cannot complain) with a concomitant decline in services, so that the Melex cart would so deteriorate as a commodity that prospective buyers would switch to higher priced OMC carts.

If price competition between Melex dealers resulted in an overall decline in service, a more highly differentiated market would be created. While such a development could conceivably be of aid to OMC, substantive and pleading problems immediately arise, either of which would defeat the claim. First and foremost, plaintiff's allegation read most favorably to plaintiff is nothing more than a complaint that defendants by use of vertical restraints have strengthened their economic clout in the marketplace by avoiding a decline in servicing capability. While it may well be true that plaintiff, as an interbrand competitor, has found Pezetel's strength as a competitor financially devastating, thereby suffering injury causally related to an antitrust violation, *Brunswick Corp., supra*, the antitrust laws protect "competition, not competitors." *Brown Shoe Co. v. United States, supra*, 370 U.S. at 320, 82 S.Ct. 1502. In the specific context of this case, the vertical restraints would be anticompetitive, if at all, only because they excluded potential intrabrand competitors from the Melex golf-cart market, or because they prevented actual intrabrand competitors from raiding each other's markets, not because they made Pezetel a more vigorous challenger in the interbrand market. Under *Brunswick, Corp., supra*, only intrabrand competitors would have standing to challenge the rea-

sonableness of the vertical territorial ·restraints.[35] *Continental T.V., Inc., supra,* 433 U.S. at 51–52, 97 S.Ct. 2549.

Moreover, OMC encounters a pleading problem of some significance: in support of its theory, plaintiff alleges only that golf-cart dealers have a long history of intense competition in servicing. While the plaintiff's factual allegations, as well as all reasonable inferences to be drawn there-·from, must be taken as admitted, *see Braden v. University of Pittsburgh,* 552 F.2d 948, 955 (3d Cir. 1977), it is difficult to accept what amounts to hypothetical supposition, particularly when other allegations in the complaint seriously undercut its validity.[36] "While, for the purpose of a motion to dismiss, facts well pleaded must be taken as true, unsupported conclusions of pleader may be disregarded, especially when limited or negated by the substance of the facts alleged." *Oppenheim v. Sterling,* 368 F.2d 516, 519 (10th Cir. 1966), *cert. denied,* 386 U.S. 1011, 87 S.Ct. 1357, 18 L.Ed.2d 441 (1967); *accord,* 2A *J. Moore, Federal Practice* ¶ 12.08 at 1266–69 (2 ed. 1975) ("For the purposes of the motion [to dismiss for failure to state a claim], the well-pleaded allegations of the complaint are taken as admitted; the conclusions of law or unwarranted deductions of fact are not admitted.").

Plaintiff's ruminations are highly speculative and hardly in the nature of a demonstrable injury. *See Bowen v. New York News, Inc.,* 522 F.2d 1242, 1255–56 (2d Cir. 1975). It is concluded that plaintiff cannot demonstrate a compensable injury under Sherman Act § 1 based on defendant's distribution scheme.

In sum, plaintiff's allegations regarding defendants' pricing scheme do not state a § 1 claim upon which relief can be granted and ·although its allegations concerning defendants' territorial restraints suffice to state a cognizable claim under § 1, plaintiff has failed to allege a direct injury to it flowing from their use. Therefore, plaintiff's claim under § 1 will be dismissed.

## IV. *Allegations Under Sherman Act § 2*

The text of § 2 of the Sherman Act provides in relevant part:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce· among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor, . . . ." [37]

Section 2 of the Sherman Act does not outlaw monopolies but rather the act of monopolization and/or the attempt to monopolize where there is a dangerous probability of success. *Swift & Co. v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). Alleging that defendants

---

**35.** Moreover, as to servicing, plaintiff faces the same practical difficulty discussed above. Intrabrand competition would ultimately weed Melex dealers out and prices and quality would again rise. Thus, OMC meets the same standing dilemma it met with respect to pricing: the task of explaining how this consolidation of Melex dealers would either benefit or injure it.

**36.** The complaint is replete with charges that Pezetel, with the support of the Polish government, has provided extraordinary relief to Melex dealers, sometimes for motives wholly unrelated to economic success in the golf-cart industry. For example, at ¶ 24 of the complaint, OMC relates that when the Melex distributors complained to Pezetel of dumping duties imposed by the Treasury Department, Pezetel agreed, in effect, to become an importer, in order to remove from the distributors the financial onus of the duties. (Defendants disputed the veracity of this allegation at oral argument, but on a motion to dismiss, the Court accepts it as entirely accurate.) Similarly, the very nub of the complaint is that Pezetel, and Poland, will take any steps to protect the integrity of Melex carts in the American marketplace:

"Defendants were and are able successfully to carry out this systematic program of predatory pricing because the Polish economy is centrally planned, controlled and administered by the Government. In its drive to capture the United States golf car market, Pezetel can easily sustain losses incurred by selling its golf cars at less than fair value and for the purpose of obtaining hard, dollar earnings which are of far greater than face value to state-controlled economies."

Complaint ¶ 26.

**37.** 15 U.S.C. § 2.

have monopolized or have attempted to monopolize the electric golf-cart industry, plaintiff points to defendants' phenomenal market success, claiming that in a few short years, Melex golf carts have attained a 35% market share of all electric golf carts sold within the United States. Plaintiff alleges defendants' success is attributable to the ability to undersell OMC and to a distribution scheme allegedly prohibiting sales by Melex dealers outside their territories.

■ For purposes of their motion to dismiss, defendants accept plaintiff's definition of the market as electric golf carts and concede that a 35% market share constitutes a "reasonable probability of success" sufficient to show an attempt to monopolize if the critical element of § 2, namely specific intent, can be shown. Concluding as a matter of law that 35% is insufficient to establish monopolization,[38] *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir. 1945) (*Alcoa*), the Court must consider plaintiff's allegations as asserting only a charge of attempted monopolization.

■ A properly pleaded charge of attempted monopolization must include an allegation that defendant acted with specific intent. *Swift, supra; Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 626, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). A naked allegation of intent, however, would not provide notice to the defendants of what conduct is complained of and need be defended. Furthermore, because deliberate conduct is the norm in conducting business and because such deliberate acts as, for example, obtaining a patent or entering a market capable of supporting only one firm are wholly lawful, *United States v. United Shoe Machinery Corp.,* 110 F.Supp. 295, 342 (D.Mass.1953), *aff'd per curiam,* 347 U.S. 521, 74 S.Ct. 699, 98 L.Ed. 910 (1954), plaintiff must allege facts from which one can infer intent of an unlawful character. *See United States Steel Corp. v. Fortner*

*Enterprises, Inc.,* 429 U.S. 610, 612 n.1, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977). Therefore, to survive a motion to dismiss, the complaint must allege facts demonstrating conduct that is not "a normal, industrial response to market opportunities, but is primarily aimed at limiting the opportunities of competitors, so as to drive them out of the market." L. Sullivan, *Handbook of the Law of Antitrust* 99 (1977). *See United States v. American Tobacco Co.,* 221 U.S. 106, 181, 31 S.Ct. 632, 55 L.Ed. 663 (1911).

### A. Predatory Pricing

Complaining of the lower prices offered to Melex dealers, plaintiff simply states, that the prices were knowingly set. In conjunction with the territorial restraints, plaintiff alleges that the "Sale and Distribution Agreements" entered into between Pezetel and defendant distributors in 1973 were substantially continued between Melex and its distributors beyond 1975 by which time defendants already controlled 35% of the market.

In evaluating whether from these allegations one can infer intent, guidance has been supplied by the Supreme Court in *United States v. Grinnell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Under *Grinnell,* a § 2 offense obtains where there is "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Id.* at 570–71, 86 S.Ct. at 1704.

■ As earlier emphasized, the low prices offered to Melex dealers by defendant manufacturer or defendant importer are not alleged to be below Pezetel's costs or otherwise predatory. Rather plaintiff simply avers that most American manufacturers are unable to produce a product competitive in price to that offered by its for-

---

**38.** Exclusive reliance upon market share alone is necessary in the unusual market situation presented by this case. In measuring the market power of a more conventional competitor—one not benefited by a government subsidy—ability to control price would be the focal point of the analysis. *United States v. E. I. DuPont,*

351 U.S. 377, 389, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Here the presence of a controlled economy conferred upon the defendants power over price that another competitor might have achieved only through unlawful anticompetitive conduct.

eign competition. That Pezetel's competitive advantage results from a government subsidy by a controlled economy that permits defendant to offer virtually identical products at a cheaper price is not actionable under Sherman Act § 2. Employing the language of *Grinnell*, such a product may be considered superior to another comparable product available only at a higher price. Certainly a firm that exploits the opportunity through technology, cheap labor or a government subsidy to offer the same product at a reduced price can be said to be responding normally to market opportunities. As such, defendants use of low prices appears to fall within the *Grinnell* exception and therefore is not considered mischievous conduct from which § 2 intent can be inferred.

■ The inquiry under § 2, however, does not end at this point. One who has attained or who is about to attain market power lawfully may not seek to perpetuate its dominance by the use of anti-competitive tactics. *Lorain Journal Co. v. United States*, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *United States v. Griffith*, 334 U.S. 100, 106–07, 68 S.Ct. 941, 92 L.Ed. 1236 (1947); *Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 709 (7th Cir. 1977); *Alcoa, supra; United Shoe Machinery Corp., supra*. Thus the remaining issue is whether the continued use of the alleged territorial restraints impermissibly sustained defendants' market position in violation of § 2.

### B. *Territorial Restraints*

■ Defendants assert several reasons why plaintiff should not be permitted to proceed on the claim respecting territorial restraints. First, defendants assert that had they intended to overtake the market, the pricing advantage itself was sufficient to effectuate this goal and thus the territorial restraints played no part. This argument is unpersuasive. Because a firm has the power to achieve a goal in a lawful fashion but instead chooses an unlawful route, the fact that the same result obtains does not excuse the illegal conduct. *But cf.*

*Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83, 89 (5th Cir. 1978). Relying on *Brunswick, supra,* defendants also argue that plaintiff lacks standing to raise this claim because only intrabrand and not interbrand competition would be destroyed by the territorial restraints. But, argue defendants, plaintiff can only be justifiably concerned about destruction of interbrand competition. In other words, "a nonconspiratorial competitor who is more likely to be a beneficiary than a victim of such wrongdoing is in no position to challenge the defendants' conduct." Handler, *Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L.Rev. 979, 993–94 (1977). Although this argument carries considerable weight when advanced against plaintiff's § 1 claim, it is not dispositive of the § 2 claim.

*Brunswick* again provides the analytical framework by which to measure plaintiff's injury, but plaintiff's § 2 claim stands on a different footing than did its § 1 claim. It has been held that this particular plaintiff lacks standing under § 1 to challenge defendants distribution scheme as an unlawful territorial restraint. How then may plaintiff proceed to demonstrate under § 2 that the use of territorial restraints was intended to injure plaintiff when it has already been concluded under § 1 as a matter of law that the use of territorial restraints could not have injured plaintiff?

Although some regard standing and injury as two sides of the same coin, *see* Handler, *supra*, 77 Colum.L.Rev. at 995, for present purposes, it is more helpful to view *Brunswick* as fashioning a test that plaintiff must ultimately meet in order to prevail on its antitrust claim. *Brunswick* teaches that plaintiff must be injured by that which makes defendants' conduct illegal. In the context of § 2, plaintiff need only show (1) that there is a dangerous probability that the defendant will achieve a monopoly in the relevant market and (2) the requisite specific intent to monopolize. *Times-Picayune Publishing Co., supra*. If defendants' conduct were found to be ille-

gal under § 2, it would be because after achieving a substantial, albeit legitimate, share of the market by virtue of its lower prices, defendants intended to destroy competition through unlawful territorial restraints. Thus, unlike plaintiff's § 1 theory where because of standing problems this particular plaintiff could prevail only if it established the illegality of lower prices independent of the territorial restraints, plaintiff's § 2 claim does not depend on demonstrating the illegality of prices but rather is focused upon the territorial restraints as reflecting an intent to eliminate competition, with resulting injuries to plaintiff.

It has already been held that Pezetel's thirty-five percent market share meets the "dangerous probability" standard. As for the intent element of the violation, I am unwilling to conclude on a motion to dismiss that the territorial restraints do not raise an inference of an intent to monopolize on the part of Pezetel. Were the trier of fact to conclude that these practices indicated an intent to monopolize the electric golf-cart market, it would be impossible to hold that this particular plaintiff—a competitor in that market—did not suffer an injury to interests protected by the Sherman Act. *See Brunswick, supra; Cromar Co. v. Nuclear Materials & Equipment Corp.*, 543 F.2d 501 (3d Cir. 1976); *Long Island Lighting Co. v. Standard Oil Co. of California*, 521 F.2d 1269, 1274 (2d Cir. 1975). As the Second Circuit has stated, "the central question is one of *competitive* injury," *GAF Corporation v. Circle Floor Co., Inc.*, 463 F.2d 752, 758 (2d Cir. 1972) (emphasis in original); and whether OMC is viewed as a direct-injury or target-area plaintiff, *see Cromar* and *Long Island Lighting, supra*, it stands to suffer *antitrust* damages from an attempted monopolization of the market from which it was allegedly driven.

Defendants maintain, however, that plaintiff cannot establish a § 2 injury because even absent territorial restraints, Pezetel's prices would have funneled sales in each territory to other Melex dealers and not to plaintiff. Plaintiff may well have undertaken an insuperable burden in seeking to establish from the territorial restraints the requisite anticompetitive intent on the part of defendants and resulting compensable injury and identifiable damages. But the issue before the Court now is not whether plaintiff will ultimately prevail but whether a cause of action has been stated under § 2 of the Sherman Act.

Finally, defendants contend that plaintiff itself has defeated its cause of action under § 2 by having pleaded that the territorial restraints had the effect of promoting interbrand competition. Relying on *Sylvania, supra*, for the proposition that vertical territorial restraints are acceptable if reasonable, defendants reason that promotion of interbrand competition is reasonable and a fortiori, the restraint is lawful. This argument goes well beyond where *Sylvania* takes the law. Although it may have the support of those commentators who reason that vertical territorial restraints are only used in situations where they achieve efficiency redounding to the good of the consumer and therefore ought to be encouraged and not condemned under the antitrust laws, Bork, *Vertical Restraints: Schwinn Overruled*, 1977 Sup.Ct.Rev. 171; Posner, *The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision*, 45 U.Chi.L.Rev. 1 (1977), the *Sylvania* Court did not go so far. Instead writing for the Court, Justice Powell detailed some of the many ways in which the use of vertical territorial restraints are salutary for business and reiterated that these restrictions "have too great a potential for the promotion of interbrand competition to justify complete prohibition." *Id.* 433 U.S. at 53, 97 S.Ct. at 2560.

Thus, although the Supreme Court overruled the per se rule of illegality set out in *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249 (1967), establishing instead a rule of reason with respect to vertical restraints, *Sylvania* does not stand for the proposition that such restraints are per se legal. Indicating that vertical territorial restraints ought to be given a fresh look and intimating that the list of already acceptable practices is likely

to be expanded,[39] the Court instructed that the rule of reason identified in *White Motor Co. v. United States*, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963), be reinstated as the guiding light. Under the rule of reason "the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint and its effect, actual or probable. . . ." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). However the *Sylvania* decision is employed, and even if one were to agree that the essential test after *Sylvania* "is whether the restraints in question promote interbrand competition sufficiently to outweigh the anticompetitive effects of the loss of intrabrand competition" Strasser, *supra*, 1977 Duke L.J. 775, 795, 834, plaintiff is not out of court. Rather, plaintiff is entitled to the opportunity to prove that the use of territorial restraints was an unlawful attempt to monopolize. Consequently defendants' motion to dismiss the § 2 count will be denied.

## V. *Allegations Under the Wilson Tariff Act*

■ Plaintiff has asserted a private right of action under section 73 of the Wilson Tariff Act, 15 U.S.C. § 8, which loosely stated prohibits "every combination, conspiracy, trust, agreement or contract" between two corporations either of which is engaged in importing articles into the United States when such conspiracy is intended to operate in restraint of lawful trade or to increase the market price in the United States for such imported article.

On its face, apart from placing special emphasis on imports, the language of the statute appears to follow closely Sherman Act § 1. Defendant Ross consequently argues that the Wilson Tariff Act is coterminous with § 1 and since plaintiff has failed to demonstrate a compensable injury under Sherman Act § 1, its action under the Wilson Tariff Act should be likewise barred. The other defendants construe the Act as implicitly applying all the provisions of the Sherman Act to foreign trade. Urging a broader interpretation than either of these, plaintiff argues that since the Sherman Act by its terms applies to foreign trade, the scope of the Wilson Tariff Act is rendered superfluous unless it is interpreted independently of the Sherman Act.

Because of the disposition of the case under Sherman Act § 2, plaintiff's position need not be addressed at length. Suffice it to say that although superficially attractive, the argument is without the support of either legislative history or case law. Rather it appears that the Wilson Tariff Act sought to make clear that import trade was subject to the scrutiny of the antitrust laws—a subject on which the Sherman Act was silent. Further, at the time of passage of the Wilson Tariff Act, the Supreme Court had not yet determined that price-fixing was illegal under the antitrust laws. *See, Adams-Mitchell Co. v. Cambridge Distributing Co., Ltd.*, 189 F.2d 913 (2d Cir. 1951) (Frank, J., dissenting).

The body of case law interpreting the Act reveals the following pattern. Although many cases involving an alleged restraint of import trade are brought exclusively under § 1 of the Sherman Act and the Wilson Tariff Act, *see e. g., Hunt, supra*, 550 F.2d 68 (2d Cir. 1977); *Fosburgh v. California & Hawaiian Sugar Refining Co.*, 291 F. 29 (9th Cir. 1923); *United States v. R. P. Oldham Co.*, 152 F.Supp. 818 (N.D.Cal.1957); *United States v. General Dyestuff Corp.*, 57 F.Supp. 642 (S.D.N.Y.1944); *Adams-Mitchell Co., supra; United States v. The Watchmakers of Switzerland Information Center*,

**39.** See e. g., *Sylvania*, 433 U.S. at 48 n.14, 97 S.Ct. 2549, and cases cited therein; *GTE Sylvania Inc. v. Continental T.V. Inc.*, 537 F.2d 980, 996–97 (9th Cir. 1976), and cases cited therein. See generally Bork, *Vertical Rev. Restraints: Schwinn Overruled*, 1977 Sup.Ct. 171; Louis, *Vertical Distribution Restraints After Sylvania: A Postscript and Comment*, 76 Mich.L.Rev. 265 (1977); Pitofsky, *The Sylvania Case: Antitrust Analysis of Non-Price Vertical Restraints*, 78 Colum.L.Rev. 1 (1978); Posner, *The Rule of Reason and Economic Approach: Reflection on The Sylvania Decision*, 45 U. Chi.L.Rev. 1 (1977); Strasser, *Vertical Territorial Restraints After Sylvania: A Policy Analysis and Proposed New Rule*, 1977 Duke L.J. 775.

*Inc.,* 1963 Trade Cases ¶ 70,600 (S.D.N.Y. 1962), § 2 is also invoked in conjunction with the Wilson Tariff Act, *Fosburgh, supra; Reliable Volkswagen S & S Co. v. World-Wide Auto Corp.,* 182 F.Supp. 412 (D.N.J.1968); *United States v. General Electric Co.,* 80 F.Supp. 989 (S.D.N.Y.1948).

Some guidance has been provided by the Supreme Court. In *United States v. Sisal Sales Corp.,* 274 U.S. 268, 47 S.Ct. 592, 71 L.Ed. 1042 (1927), the court determined that an agreement between several American companies and Mexican corporation to control the importation of sisal violated the Wilson Tariff Act because it was intended to destroy competition by price-fixing and to monopolize trade in that market. Thus, although the Court did not separately analyze § 1 and § 2 of the Sherman Act, it is clear that monopolizing conduct prohibited by § 2 was thought to come within the scope of the Wilson Tariff Act. A contrary conclusion would create the anomalous result of prohibiting some anti-competitive practices which restrain trade but not others which actually succeed in creating a monopoly. Because this result would not give full effect to the desire expressed by Congress to eliminate concerted anticompetitive action achieved through an abuse of the importation laws, *W. Fugate, Foreign Commerce and the Antitrust Laws* 393–94 (1973 ed.), it is concluded that the Wilson Tariff Act, in making the antitrust provisions explicitly applicable to import trade, embraces both sections of the Sherman Act.

█ Pointing out that the Wilson Tariff Act was a piece of pro-consumer legislation designed to cut consumer costs by lowering tariffs and outlawing monopolistic prices set by foreign importers, *Adams-Mitchell Co., supra,* 189 F.2d 920, the defendants maintain that the action should be dismissed because their conduct had the undisputed effect of providing lower prices to the American consumer. While this fact may cause plaintiff considerable difficulty in proving intent to restrain trade under the Wilson Tariff Act and intent to monop-

olize under § 2 of the Sherman Act, it alone is not sufficient basis on which to base a summary dismissal. Additional facts are required to determine whether defendants' conduct constitutes an assault upon the competitive system or a triumph of it. Consequently, defendants' motion with regard to the Wilson Tariff Act will be denied.

## VI. *Allegations Under the Antidumping Act of 1916*

█ The phenomenon of dumping has been described as "price discrimination between purchasers in different national markets." *J. Viner, Dumping: A Problem in International Trade* 4 (1966 ed.). Providing a private right of action, section 801 of the Revenue Act of 1916, 15 U.S.C. § 72, commonly known as the Antidumping Act of 1916, prohibits importation of articles into the United States "at a price substantially less than the actual market value or wholesale price of such articles, at the time of exportation to the United States, in the principal markets of the country of their production, or other foreign countries to which they are commonly exported," provided that such conduct is done for purposes of injuring domestic industry and the plaintiff was so injured.

Upholding the constitutionality of the 1916 Act from a challenge on vagueness grounds, one court has interpreted the Antidumping Act to forbid "regular, continued price discrimination between purchasers in different national markets whenever the discrimination is motivated by a desire to destroy competition." *Zenith Radio Corp. v. Matsushita Electric Industries Co., Ltd.,* 402 F.Supp. 251, 259 (E.D.Pa.1975).

Asserting a right of action under the 1916 Act, plaintiff asserts that defendants "have imported . . . electric golf carts within the United States at prices substantially less than the actual market values or wholesale prices of such or similar products, . . . in the principal markets of countries to which they are commonly exported." [40] Despite the reference to more than one mar-

**40.** Doc. 1 at ¶ 49.

ket, plaintiff does not suggest that there is any market other than the United States or that a comparative market analysis as contemplated by the Act is possible. Rather it is undisputed that Melex golf carts are manufactured for virtually exclusive importation to the United States; Melex golf carts are not sold in Poland nor are they commonly exported to other countries.

Plaintiff's argument revolves around the use of the term "market value" which was also employed in the Tariff Act of 1913 and reiterated in the Emergency Tariff Bill of 1921, also known as the Antidumping Act of 1921, 19 U.S.C. § 160 *et seq.* The Tariff Acts empower the Secretary of the Treasury to assess duties on articles imported into the United States and instruct the Secretary that the foreign market value is the "price, at the time of exportation of such merchandise to the United States, at which such or similar merchandise is sold or, in the absence of sales, offered for sale in the principal markets of the country from which exported." 19 U.S.C. § 164(a). When there are no sales in the home market from which to construct market value, however, the Secretary is advised to consider the cost of production, 19 U.S.C. § 164(b), and ultimately to construct a value, 19 U.S.C. § 165, on which to base a tariff.

From this statutory scheme, plaintiff argues that it is entitled to bring a private action under the Antidumping Act of 1916 by relying on the usual or average wholesale price for similar goods in the United States as the basis from which plaintiff's damages are measured. However useful an appraising officer finds an alternative formulation of market value based, for example, on cost of production or wholesale price, *Goodyear Tire and Rubber Co. v. United States,* 11 Ct.Cust.App. 351 (1922), it ap-

pears to have little bearing on the private right of action afforded to litigants under the Act of 1916.

In enacting the Act of 1916, Congress, aware by reason of the Tariff Act of 1913 of possible alternative interpretations of "actual market value," saw fit to qualify these words by the language "in the principal markets of the country of their production, or of other foreign countries to which they are commonly exported." One has to assume these words were chosen for their plain meaning. Furthermore, the legislative history of the Antidumping Act of 1921 makes clear that the provisions dealing with "value" in the 1916 Act were intended to remain unchanged.[41] In a statute which is considered sufficiently unambiguous to withstand constitutional attack, *Zenith, supra,* these words, in particular, convey a clear unequivocal meaning that cannot be ignored. Plaintiff's argument that the Antidumping Act provides a private right of action to challenge activity in a single market is rejected and its claim under 15 U.S.C. § 72 will be dismissed.

## CONCLUSION

Having considered defendants' motion to dismiss the complaint on both jurisdictional grounds and on the basis that plaintiff has failed to state claims upon which relief can be granted, the Court's holdings are summarized as follows. Defendants Boylan and Eddietron, who have transacted no business within the District of Delaware, lack the minimal contacts from which jurisdiction in this forum can be inferred. Consequently, the action with respect to them is dismissed on all counts. In this regard, plaintiff's motion to transfer the action to other districts wherein Boylan and Eddietron are located is denied.

---

**41.** 67th Cong., 1st Sess., May 21, 1921, P.L. No. 10 § 303(a) of the Emergency Tariff Bill of 1921 provides:

"Wherever . . . relative to the appraisement of imported merchandise (except [with regard to] section 801 of the Revenue Act of 1916) [Antidumping Act of 1916] reference is made to the value of imported mer-

chandise . . . such reference shall, in respect to all merchandise imported on or after the day the Act takes effect, be construed to refer to . . . actual market values as defined by the law in existence at the time of the enactment of this Act, or to export value as defined in section 302 of the Act, whichever is higher.' "

In contrast, jurisdiction over all other defendants appears to be well founded. Furthermore, arguments that jurisdiction not be exercised in light of the act-of-state doctrine and related theories are deemed unpersuasive as justification upon which to withhold the exercise of jurisdiction at the present time.

With respect to the substantive claims, the complaint alleges violations of Sherman Act § 1 and § 2, the Wilson Tariff Act and the Antidumping Act of 1916. As to each charge, plaintiff specifically asserts that defendants offered lower prices than those charged by plaintiff and employed a distribution scheme predicated upon territorial restraints. Defendants' motion to dismiss with respect to Count 1 which alleges violation of Sherman Act § 1 will be granted as to all defendants. A simple assertion that one's pricing scheme is lower than another's is insufficient to state a claim upon which antitrust relief can be based. In connection with the second allegation concerning territorial restraints, plaintiff has presented a colorable antitrust claim under § 1 but has failed to allege a direct injury flowing from their use.

Defendants' motion concerning Count 2 alleging violation of Sherman Act § 2 will be denied. Although the 35% proposed market share allegedly controlled by defendants does not suffice to present a claim of monopoly action, it does present a properly pleaded charge of attempted monopolization. The requisite intent to monopolize may be arguably inferred from the use of territorial restraints and plaintiff must be provided an opportunity to so demonstrate.

Defendants' motion to dismiss Count 3 asserting violation of the Wilson Tariff Act will be denied in that the provisions of the Wilson Tariff Act rendered unlawful activity proscribed by Sherman Act § 2. Thus, to the extent plaintiff has alleged a bona fide claim of attempted monopolization, it may also proceed under the Wilson Tariff Act. Finally, Count 4 averring violation of the Antidumping Act will be dismissed. In the absence of sales by defendants in the home territory or in another country of exportation, the comparative analysis of sales contemplated by the statute is rendered impossible. Consequently, because defendant's products are allegedly manufactured for exclusive exportation to the United States, no relief can be granted under the Antidumping Act.

Submit order on notice within 20 days.