**OUTBOARD MARINE CORP., a Delaware Corporation, Plaintiff,**

v.

**PEZETEL, a Foreign Trade Organization of the People's Republic of Poland, Melex USA, Inc., a Delaware Corporation, Fern Clo Golf Car Co., Inc., a Pennsylvania Corporation, Ross Products, Inc., a Delaware Corporation, Defendants.**

Civ. A. No. 77–51.

United States District Court,
D. Delaware.

June 22, 1979.

William O. LaMotte, III, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for plaintiff; Charles Owen Verrill, Jr., and Donald A. Lofty, Patton, Boggs & Blow, Washington, D. C., of counsel.

James T. McKinstry, Richards, Layton & Finger, Wilmington, Del., for defendants Pezetel and Melex, USA, Inc.; Henry W. Sawyer, III, Stewart Dalzell, John Chesney, and Mark M. Wilcox, Drinker, Biddle & Reath, Louis B. Schwartz, Philadelphia, Pa., of counsel.

James T. McKinstry, Richards, Layton & Finger, Wilmington, Del., for Ross Products, Inc.; Gerald J. Brown, Cahill, Gordon & Reindel, Washington, D. C., of counsel.

Paul H. Spiller, Kimmel & Spiller, Wilmington, Del., for Fern Clo Golf Car, Inc.

## OPINION

MURRAY M. SCHWARTZ, District Judge.

In this civil antitrust action, the plaintiff Outboard Marine Corporation ("OMC") has moved for the dismissal of the defendants' Counterclaim for failure to state a claim upon which relief can be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Counterclaim has been asserted by Pezetel and Melex, Inc., two of the three remaining defendants in this litigation.[1] Pezetel is a trade organization of the People's Republic of Poland and a manufacturer and exporter of electric golf carts to the United States. Melex USA, Inc., is its wholly owned subsidiary and as such, it functions as a domestic distributor of Pezetel's golf carts in those territories where Pezetel has not established a relationship with a domestic distributor.[2] The plaintiff, Outboard Marine Corporation, is an American manufacturer whose subsidiary, Cushman, formerly manufactured gas and electric golf carts and has now been dissolved.

A detailed description of the American golf-cart market has already been set forth in this Court's prior opinion on defendants' motion to dismiss. See *Outboard Marine Corporation v. Pezetel,* 461 F.Supp. 384 (D.Del.1978), and will only be repeated here to the extent necessary to provide a background for an illustration of the bases upon which the defendants' Counterclaim rests. In 1970 a predecessor of Pezetel, Electrim Foreign Trade Company for Electrical Equipment, Ltd., commenced manufacturing of an electric golf cart duplicative of one sold in the American market. Three years later, Pezetel succeeded Electrim as a Polish manufacturer and it then brought Melex into existence, a wholly owned subsidiary incorporated in Delaware, and at about the same time established agreements with several American distributors. In that year Polish-made golf carts constituted seventeen percent of the United States electric golf cart market and by 1975, Melex carts allegedly represented thirty-five percent of sales in the electric golf cart market in the United States. Meanwhile, OMC, unable to meet Pezetel's low prices, gave up the manufacture of electric and gas golf carts in 1975. In 1977, it filed this suit seeking treble damages resulting from its declining sales and eventual departure from the market place.

All defendants moved to dismiss the complaint for failure to state a claim on a number of grounds, none of which are par-

---

1. On an earlier motion to dismiss the complaint for failure to state a claim, this Court ruled that several of the distributors against whom a cause of action had been asserted were not amenable to this Court's jurisdiction. *Outboard Marine Corporation v. Pezetel,* 461 F.Supp. 384 (D.Del.1978). Ross Products and Fern Clo Golf Car, Inc., the only independent domestic distributors of Polish golf carts still in the litigation after the motion to dismiss, are not parties to the counterclaim.

2. *Id.* at 389.

ticularly relevant to the present motion. Suffice it to say that as a result of their motion, several of plaintiff's counts and claims against two defendants were dismissed.

On a motion to dismiss for failure to state a claim, this Court is of course bound to construe the Counterclaim in the light most favorable to the defendants, taking all facts stated therein and all reasonable inferences therefrom as admitted. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Defendants' Counterclaim contains four operative paragraphs, paraphrased below: (1) Counterclaim ¶ 16: OMC, in conspiracy with other manufacturers of golf carts, has "misused and abused" governmental processes by submitting complaints, petitions, testimony and other information to federal governmental agencies and offices including but not limited to the Treasury Department and United States Customs Service, the International Trade Commission, the Congress of the United States, and the federal court. (2) Counterclaim ¶ 17: OMC and its coconspirators submitted to the Treasury Department and the United States Customs Service "knowingly false information" respecting the prices of electric golf carts built in Canada, in the course of agency proceedings that resulted in the imposition of dumping duties against Pezetel's distributors and eventually against Melex. (3) Counterclaim ¶ 18: OMC conspired with other American manufacturers of golf carts to engage in "a joint program of threatened litigation and publicity." (4) Counterclaim ¶ 19: OMC joined with other manufacturers in order to falsely convey to potential Melex customers that Melex "was about to go out of business." Although the Counterclaim is not crystal clear with respect to the precise impact of each of these challenged practices upon the financial well-being of Pezetel in the market place, the Counterclaim alleges that all four courses of action were undertaken with the intent "to arouse fear among [Pezetel's] distributors that they would be required to pay dumping duties or post bonds for the payment of such duties, and by arousing fear among customers of the prospective discontinuance of service and spare parts by Melex."

As to the first two charges above, the plaintiff invokes the immunity of the Noerr-Pennington doctrine, discussed more fully below. Both the claim of disparagement and the charge relating to the publicity campaign, ¶¶ 18, 19, do not implicate that doctrine and thus will be discussed separately.

## I. SHERMAN ACT CLAIMS

### A. APPLICATION OF THE NOERR–PENNINGTON DOCTRINE TO THE ALLEGATIONS OF THE COUNTERCLAIM

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court held that collaborative efforts by competitors to influence the legislative or executive branch of the government were immune from antitrust scrutiny even though undertaken with anticompetitive intent. "No violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." *Eastern Railroad Conference v. Noerr Motor Freight, supra,* 365 U.S. at 135, 81 S.Ct. at 528. The Supreme Court founded its decision in *Noerr* upon two considerations:

In the first place, such a holding [that the Sherman Act applied to efforts to influence the passage or enforcement of laws] would substantially impair the power of government to take action through its legislature and executive that operate to restrain trade. In a representative democracy such as this, these branches of government act on behalf of people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. . . . Secondly, and of at least equal significance, such a construction of the Sherman Act would raise important constitutional questions. The right of petition is one of

the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.

365 U.S. at 137–38, 81 S.Ct. at 529–530.

The antitrust immunity conferred by the Noerr-Pennington Doctrine is not absolute, however. The Supreme Court recognized in *Noerr* that a case could arise in which the conspiracy involving political activity was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and [in such a case] the application of the Sherman Act would be justified." *Id.* at 144, 81 S.Ct. at 533. Until the Supreme Court's decision in *California Motor Transport v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), the scope of the so-called "sham" exception remained unexplored. In *California Motor Transport*, several trucking firms brought suit against some of their competitors alleging that the latter had conspired "to institute state and federal proceedings to resist and defeat applications by [plaintiffs] to acquire operating rights or to transfer or register those rights." *Id.* at 509, 92 S.Ct. at 611. The Supreme Court held that a claim had been stated under the Sherman Act. What provoked the invocation of the "sham" exception were allegations in the complaint:

> that the power, strategy, and resources of the petitioners [defendants] were used to harass and deter respondents in their use of administrative and judicial proceedings so as to deny them "free and unlimited access" to those tribunals. The result, . . ., was that the machinery of the agencies and the courts was effectively closed to [plaintiffs], and petitioners indeed became "the regulators of the grants of rights, transfers and registrations" to respondents—thereby depleting and diminishing the value of the businesses of respondents and aggrandizing petitioners' economic and monopoly power.

*Id.* at 511, 92 S.Ct. at 612 (citation omitted). Most troublesome to the Supreme Court were allegations that the concerted efforts of the defendants to bar the plaintiffs from any and all access to administrative and judicial tribunals "with or without probable cause, and regardless of the merits of the cases" resulted in a deprivation of meaningful access to the agencies and courts. Although the Court painstakingly emphasized that the Noerr-Pennington immunity extended to the adjudicatory setting, it distinguished between unethical practices in the legislative setting and unethical conduct in an adjudicatory proceeding: "There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *Id.* at 513, 92 S.Ct. at 612. Such misconduct, the Court emphasized, could not be deemed "political expression," entitled to antitrust immunity. *Id.* As examples of the types of conduct not immunized in the adjudicatory setting the Court listed perjury, bribery, a conspiracy in which a governmental authority participated and fraud. *Id.* at 512–13, 92 S.Ct. 609, 613.

Paragraph 16 of the Counterclaim contains a variety of broadly worded and nonspecific charges that OMC has participated in or instituted a variety of baseless and harassing proceedings and has "abused and misused" the governmental process in a large number of governmental forums, "including but not limited to the United States Treasury Department and Customs Service, the International Trade Commission, the Congress of the United States, and the federal court." OMC argues that this charge is conclusory in its entirety, failing to specify what legal proceedings or what testimony before Congress was objectionable and on what ground, and therefore fails to comply with the minimal notice-pleading standards of Rule 8 because OMC cannot discern what behavior must be defended. Moreover, OMC refers to a thread in the Noerr-Pennington case law that requires more specific pleading of facts arguably protected by the Noerr-Pennington Doctrine to counteract any possible "chilling" of First Amendment rights:

[T]o state a claim for relief under the [*California Motor Transport*] exception, a complaint must include allegations of the specific activities, not protected by *Noerr*, which plaintiffs contend have barred their access to a governmental body.

\* \* \* \* \* \*

In holding that plaintiffs' allegations are insufficient in this case, we are not adopting a rule that so-called "fact" pleading, as distinguished from "notice" pleading, is required in antitrust cases. . . . What we do hold is that in any case, whether antitrust or something else, where a plaintiff seeks damages or injunctive relief, or both, for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required.

*Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board*, 542 F.2d 1076, 1082–83 (9th Cir. 1976) (citations omitted), *cert. denied*, 430 U.S. 940, 97 S.Ct. 1571, 51 L.Ed.2d 787 (1977).[3] The Court agrees that ¶ 16, conceded by defendant to be a "general" allegation,[4] cannot stand alone. In so holding, however, the Court does not intimate that the higher pleading standard of *Franchise Realty* is adopted. The broadly worded claim simply encompasses too many unformulated subsidiary allegations. For example, the Counterclaim

mentions some agencies specifically but intimates that others have also been subjected to abuse by OMC. Most perplexing is the language "including but not limited to." Moreover, the misconduct alleging "misusing and abusing governmental process" and the submission of "sham, false and misleading allegations and information without regard to the truth or merits made,"[5] does little or nothing to put the plaintiff on notice. Obviously, Rule 8 does not require a detailed statement of facts, but it does require a plain statement showing entitlement to relief, not conclusions of law, like "misusing and abusing" and "sham, false and misleading," and vague references to generalized abuses in a variety of unspecified governmental forums. Such conclusory phraseology begs the question. *See Franchise Realty, supra* at 1079; *Clayton v. Clayton Bank*, 424 F.Supp. 163, 166 (E.D.Mo. 1976).[6] It is concluded that to the extent that ¶ 16 was intended by the defendants to stand alone as a claim under the Sherman Act, it is hopelessly vague and would have to fail. As a consequence, Pezetel-Melex's claim that OMC has "abused and misused" Congress and unnamed federal agencies will be dismissed. The language relating to Pezetel-Melex's economic injury, however, will be deemed to have survived and read as applicable to each remaining operative paragraph. The charge of abuse of the federal court contained in ¶ 16, however, creates problems of its own and will be discussed below.

**3.** To like effect is the thesis of the writer of Note, *Limiting the Antitrust Immunity for Concerted Attempts to Influence Courts and Adjudicatory Agencies: Analogies to Malicious Prosecution and Abuse of Process*, 86 Harv.L. Rev. 715, 725 (1973), which suggests the burden of proving misconduct before an administrative tribunal be upon clear and convincing evidence, to prevent a chilling of First Amendment rights. At this stage of the proceedings, of course, the Court need not address the question whether a higher standard of proof should apply to the charges of the Counterclaim.

**4.** Doc. 70 at 100.

**5.** Doc. 48 ¶ 16.

**6.** Specific identification of the governmental agency is particularly significant in the Noerr-Pennington area because the scope of the de-

fense widens with the discretion of the forum. Professors Areeda and Turner emphasize:

> [T]here is no privilege to resort to governmental processes as a "sham" or in bad faith. Identifying such situations is difficult—least difficult for judicial processes, more difficult for administrative adjudication, much more difficult for executive processes where it is virtually impossible to identify the "sham."
> The breadth of a government organ's discretion indicates the sweep of facts and arguments which may legitimately be presented to it. In a political forum, almost no contention can be characterized categorically as frivolous.

Areeda & Turner, *Antitrust Law I*, ¶ 203c at 44 (1978) (hereinafter "*Antitrust Law*").

Despite the breadth of the introductory paragraph, later claims, taken together with briefs and oral argument, demonstrate that the charges against OMC relating to the Noerr-Pennington Doctrine, focus on two distinct undertakings: (1) OMC has harassed the defendants by filing and/or threatening to file baseless and harassing lawsuits in the outcome of which OMC has no real interest. (2) OMC submitted or caused to be submitted knowingly false information to the Treasury Department and the United States Custom Service respecting the prices of golf carts built in Canada, with the intent and hope that the Department would determine that Pezetel-Melex was selling golf carts at less than their fair market value and that dumping duties would then be assessed, causing defendants competitive injuries. Discussed first will be the allegations respecting "threatened" and/or actual litigation, and then attention will be turned to the charge that OMC conspired with others to submit knowingly false information to a federal agency.

■ Unfortunately, a reading of the Counterclaim does not reveal whether defendants' antitrust claim involves the *threatening* of lawsuits, as ¶ 18 of the Counterclaim suggests in the language: "OMC combined and conspired with [others] to engage in a joint program of threatened litigation and publicity" or alternatively, whether defendants claim that OMC has actually commenced harassing and baseless suits in federal court, as ¶ 16 suggests. At oral argument counsel for defendants stressed the latter point, whereas ¶ 18 itself focuses on a course of action that falls short of actual litigation. To the extent that the "joint program of threatened litigation" took the form of a publicity campaign and that no actual litigation was contemplated, the allegation involves the Noerr-Pennington Doctrine only peripherally, if at all, since no exercise of the First Amendment right of petition would have been implicated in a mere publicity campaign directed at the public generally and only at govern-

ment incidentally. As such, the allegation will be discussed below in connection with the claim of business disparagement.[7] To the extent that it is suggested by ¶ 18, either alone or in combination with the abuse of judicial process charge of ¶ 16, that OMC threatened to bring lawsuits against the defendants that it had every intention of actually filing, this Court agrees with the court in *Clairol, Inc. v. Boston Discount Center*, 1976–2 *Trade Cas.* ¶ 61,108, at 70,-021 (E.D.Mich.1976), that if resort to the courts is protected by Noerr-Pennington, then threats to do so, without more, are likewise immune from liability.

■ The Counterclaim ¶ 16, however, may quite generously be read to allege that OMC has actually brought abusive and harassing suits in federal court. At oral argument, counsel of defendants amplified on this allegation by suggesting that the inference be drawn that Outboard Marine has abused the judicial process to Pezetel-Melex's antitrust injury by filing frivolous lawsuits in Michigan and North Carolina against two of Pezetel's distributors, Boylan, Inc., and Eddietron, Inc., respectively, both entities having been dismissed as parties to this lawsuit for lack of in personam jurisdiction.[8] It is argued by the defendants that the baselessness of the lawsuits is obvious from the very economic nature of the defendant distributors. Because golf-cart distributorships are such low capital-investment enterprises, OMC cannot and does not reasonably expect to recover from them the losses attributable to OMC's demise as a golf-cart manufacturer, and hence the only purpose of such a maneuver, defendants argue, must be to harass. More specifically, it is urged that the plaintiff filed the suits against unlikely defendants in an effort to intimidate the distributors and harass Pezetel-Melex. The defendants have not alleged that OMC has acted illegally or improperly in its conduct of the litigation, but merely that the litigation was commenced for no reason other than its harassment value.

---

7. *See* notes 20–21 *infra* and accompanying text.

8. *Outboard Marine Corp. v. Pezetel, supra* at 393.

Because the spectre of the North Carolina and Michigan suits as an embellishment upon the Counterclaim only arose at oral argument, OMC has not squarely addressed the merits of Pezetel-Melex's contentions.[9] It is held, however, that the defendants' allegation respecting abuse of the federal court, must be rejected for the reason that Pezetel-Melex has not shown, either by factual allegations or argument, that these suits are harassing and baseless other than by merely denominating them as such. First, no great effort need be expended in emphasizing that the merits of the lawsuits, as distinct from the particular parties named, are identical to those of the case presently pending before this Court.[10] OMC's complaint here has in measure survived a motion to dismiss and no question exists that this litigation is not frivolous on its merits.[11]

If the merits of the North Carolina and Michigan suits are not baseless, and the Court is confident in holding that any complaint identical to the one filed here is not, then defendants are left with their theory that harassment should be inferred from the relative impecunity of the distributors, Boylan and Eddietron. As defendants point out, however, Outboard Marine is no longer a participant in a golf-cart market and cannot be seriously interested in injunctive relief. Presumably for the same reason, OMC would have little interest at this late date in so harassing Pezetel's allegedly impecunious distributors that the latter determine to terminate business relationships with the Polish concern. Conversely, it is highly improbable that the elimination of two distributors would deliver a mortal wound to the defendants' American enterprise.

More fundamentally, however, this Court is unwilling to hold that a claim of harassing and baseless litigation can be stated merely through the allegation that an abuse of the judicial process has occurred and the argument that deeper-pocket defendants either are available or have already been sued. Nor do the Supreme Court decisions on the subject suggest anything to the contrary. In *Vendo Co., supra*, the harassing aspect of the state-court litigation upon which the "sham" claim was founded were the merits themselves: the underlying covenants against competition sought to be enforced in the allegedly harassing litigation. Similarly, in *Otter Tail Power Co. v. United States*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973), the government obtained a decree against a utility company, restraining them "from instituting, supporting, or engaging in litigation, directly or indirectly, against municipalities . . . who have voted to establish municipal electric power systems." *Id.* at 369, 93 S.Ct. at 1025. Even that case, however, involved at least four separate lawsuits, all carried by Otter Tail to the highest state court and all unsuccessful on the merits. *Otter Tail Power Co. v. United States*, 331 F.Supp. 54, 61–62 & 62 n.4 (D.Minn.1971).[12] It is con-

---

**9.** OMC has, however, voiced a continuing objection to the sufficiency of the Counterclaim on the basis that a "pattern" of baseless or repetitive acts has not been alleged. At least with respect to the two federal-court actions, however, the Supreme Court has strongly suggested that one harassing piece of litigation may be enough to invoke the protection of the antitrust laws under the *California Motor Transport* exception. *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623, 635 n.6, 652–53, 97 S.Ct. 2881, 53 L.Ed.2d 1009 (1977) (plurality opinion of Rehnquist, J., and concurring opinion of Stevens, J.).

**10.** Doc. 70 at 101–02.

**11.** Nor is this Court particularly concerned that OMC may have included counts in the North Carolina and Michigan suits that were dis-

missed by this Court as against the remaining defendants here. Any cautious litigator interested in recovery would have adopted the same approach. Other courts may well view OMC's complaint in a different light and the plaintiff is entitled to act on that hope or expectation. Stated simply, the counts dismissed here were by no means dismissed as frivolous. *See Outboard Marine Corp. v. Pezetel, supra*, at 399–403, 408–09.

**12.** The Supreme Court in *Otter Tail, supra*, ordered a remand for a determination whether the lawsuits fell within the "sham" exception of *California Motor Transport*, decided after the district court's opinion. While it is true that the complaint in *Otter Tail*, to the extent that it is quoted in the district court's opinion, *see* 331 F.Supp. at 56, appears every bit as generally

cluded that the defendants' Counterclaim has not alleged harassment or similar misconduct with respect to the North Carolina and Michigan suits sufficient to come within the "sham" exception to the Noerr-Pennington Doctrine.

■ In support of the charge OMC combined with others to submit knowingly false information to federal agencies, Pezetel-Melex point to the following language of *California Motor Transport* for the proposition that Counterclaim ¶ 17, without more, constitutes a violation:

There are many other forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations. Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process. Opponents before agencies or courts often think poorly of the other's tactics, motions, or defenses and may readily call them baseless. One claim, which a court or agency may think baseless, may go unnoticed; but a pattern of baseless, repetitive claims may emerge which leads the factfinder to conclude that the administrative and judicial processes have been abused. That may be a difficult line to discern and draw. *But once it is drawn, the case is established that abuse of those processes produced an illegal result, viz., effectively barring respondents from access to the agencies and courts.* Insofar as the administrative or judicial processes are involved, actions of that kind cannot acquire immunity by seeking refuge under the umbrella of "political expression."

*California Motor Transport, supra*, 404 U.S. at 513, 92 S.Ct. at 613 (emphasis added). On the one hand, Outboard Marine would have this Court focus very narrowly on the emphasized sentence above and dismiss the Counterclaim on the basis of Pezetel's concession that Melex, its distributor, has participated in the agency proceedings at which the false data is alleged to have been submitted and which ultimately resulted in an assessment of dumping duties against defendants. On the other hand, although Pezetel-Melex has conceded that it had access in the physical sense to the proceedings,[13] it urges that the foregoing passage sketches with a broad brush several variations on the "sham" exception, only one of which is alleged by Pezetel in ¶ 17 of the Counterclaim.[14] Both sides' readings of the passage would be plausible if the case stood alone; although subsequent lower-court decisions, however, discussed below, throw additional weight on defendants' side of the scale.

Initially, it is observed that if plaintiff's argument were accepted and access in the physical sense were enough to vitiate a "sham" claim under *California Motor Transport*, then it is exceedingly difficult to imagine how a claim could arise in a judicial setting, where the due process clause guarantees access and full participation for all parties. Certainly, the Court's language above included judicial proceedings. For this reason alone, plaintiff's bright-line argument respecting access would have to be rejected.

drafted as the Counterclaim here, the district court in that case was evidently under the impression, possibly correct at the time but certainly erroneous in light of *California Motor Transport*, that the Noerr-Pennington doctrine had no application to judicial proceedings such as state-court litigation. Now, it is clear that resort to the courts, even if taken with anticompetitive intent, is protected under the Noerr-Pennington doctrine.

**13.** Doc. 70 at 76–77.

**14.** As Pezetel-Melex read *California Motor Transport*, the sham exception may be based on a variety of models including: (1) upon the

perjury-fraud-bribery model, as alleged in Counterclaim ¶ 17; (2) upon an assertion that the conspirators participated in agency or court action with little or no interest in obtaining government action but simply to harass, a purely "sham" undertaking as described by the Supreme Court in *Noerr, supra*; (3) upon the charge that the antitrust plaintiff was excluded in a literal sense from the administrative forum that would lead to participation in a market, *see California Motor Transport, supra*, so that the government merely acted as an unwitting surrogate for the conspirators. Doc. 70 at 69–71.

Pezetel places great reliance on a Fifth Circuit case predating *California Motor Transport, Woods Exploration & Producing Co. v. Aluminum Company of America,* 438 F.2d 1286 (5th Cir. 1971), *cert.* denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972), in which the court held that the submission of false data respecting the productivity of certain wells by Texas gas producers to a state regulatory body, in an attempt to persuade that body to reduce the allowable amount of gas that plaintiffs could take from their gas fields stated a claim under the Sherman Act. The similarity between *Woods* and the present dispute, defendants argue, is that in both instances, the complaint centered upon the fact that the governmental agency involved was forced by the regulatory process itself to rely on factual materials submitted by private parties and in both cases, the submission of false data resulted in a subversion of the regulatory process and deprived the claimants of any meaningful opportunity to take advantage of any access to the proceeding available to them. Although the *Woods Exploration* holding that the Noerr-Pennington Doctrine applies only to the political processes has been overruled in *California Motor Transport,* the Supreme Court's dicta quoted above strongly suggests that the Court did not consider the sort of misconduct exemplified by *Woods Exploration* outside the scope of antitrust attack.[15]

The post-*California Motor Transport* case most directly on point is *Israel v. Baxter Laboratories, Inc.,* 151 U.S.App.D.C. 101, 103, 466 F.2d 272 (D.C. Cir. 1972), in which the plaintiff drug manufacturers complained that certain of their competitors had conspired to prevent plaintiff's new drug from being approved by the Food and Drug Administration by "suppressing, concealing and misconstruing information concerning the two drugs before the FDA; by arranging for the employment as a consultant to the FDA of a medical doctor who had a financial interest in [defendant]; . . . and by misrepresenting the safety and efficacy of [plaintiff's product]." *Id.* 151 U.S. App.D.C. at 103, 274. Although the *Israel* court ultimately ordered a remand to the agency for a second determination whether plaintiff's drug should be given FDA approval, the Court of Appeals expressly preserved plaintiffs' right to prove their antitrust claims, plaintiffs having alleged that "the real purpose of defendants' joint efforts [before the FDA was] to preclude, not induce, fair FDA consideration" of plaintiff's product. *Id.* 151 U.S.App.D.C. at 108, 279. In discussing *Woods Exploration, supra,* and the Circuit Court decision in *California Motor Transport,* the District of Columbia Circuit observed, "[t]he basic concern of the courts of appeal (and one District Judge) in both *Woods* and *Trucking Unlimited* may be deemed the integrity of the regulatory process. No actions which impair the fair and impartial functioning of an administrative agency should be able to hide behind the cloak of an antitrust ex-

---

**15.** Even more factually apposite is the Supreme Court's own opinion in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), in which the counterclaim in a patent infringement action alleged that the plaintiff had obtained the patent by knowing and willful misrepresentations before the Patent Office. The Court held that such fraud, if proven in combination with the necessary market power, would violate § 2 of the Sherman Act. Of course, competitors possess no right of access to Patent Office initial patent application proceedings and thus in a limited sense, *Walker Process* does OMC no harm on its access argument. In that case, however, the Supreme Court rejected the argument made here that if misconduct occurred in the agency, the agency itself must rectify the error and the antitrust court cannot intervene:

> The trial court dismissed its suit not because Walker failed to allege the relevant market, the dominance of the patented device therein, and the injurious consequences to Walker of the patent's enforcement, but rather on the ground that the United States alone may "annul or set aside" a patent for fraud in procurement. The trial court has not analyzed any economic data. Indeed, no such proof has yet been offered because of the disposition below. In view of these considerations, as well as the novelty of the claim asserted and the paucity of guidelines available in the decided cases, this deficiency cannot be deemed crucial.

*Id.* at 178, 86 S.Ct. at 351.

178

emption." *Israel v. Baxter Laboratories, Inc., supra,* 151 U.S.App.D.C. at 107, 466 F.2d at 278–79. Other courts, although not all directly confronted by the allegation pleaded here, have interpreted *California Motor Transport* as creating a cause of action based upon unethical or illegal behavior before an adjudicatory body. *See, e. g., Rodgers v. Federal Trade Commission,* 492 F.2d 228, 232 n.6 (9th Cir.), *cert. denied,* 419 U.S. 834, 95 S.Ct. 60, 42 L.Ed.2d 60 (1974); *Semke v. Enid Automobile Dealers Association,* 456 F.2d 1361, 1366–67 (10th Cir. 1972). Similarly, lower federal courts have interpreted *California Motor Transport* as excluding gross misconduct in an adjudicatory setting or abuse of process from the Noerr-Pennington immunity.[16] *See Rush-Hampton Industries v. Home Ventilating Institute,* 419 F.Supp. 19, 24 (M.D.Fla.1976); *Control Data Corp. v. International Business Machines Corp.,* 306 F.Supp. 839, 849 (D.Minn.1969), *aff'd,* 430 F.2d 1277 (8th Cir. 1970). None of the cases cited above appear to concur with plaintiff's interpretation that the "sham" exception can only be successfully invoked when literal exclusion from the agency proceedings has occurred.

 Having rejected plaintiff's objections respecting access, the Court turns to plaintiff's more troubling argument that any decision by the Treasury Department adverse to the defendants was the product of agency action, not of any impropriety on the part of plaintiff. Although OMC does not express it as such, this argument is essentially addressed to the not insignificant problem of causation raised by the Counterclaim. Even assuming that plaintiff conspired with others in the submission of false data to the Treasury Department, is the Court to assume that the Department made no independent fact-finding but relied exclusively on the data submitted by interested private parties?[17] OMC makes much of the fact that Pezetel has not alleged reliance by the agency in its Counterclaim. Given that the matter is before the Court on a motion to dismiss, it is abundantly clear that all assumptions with respect to the quality of the proof must be in defendants' favor. Although the Court essentially agrees that Pezetel faces substantial difficulties in proving the elements of the violation charged in the Counterclaim: that a conspiracy existed for the purpose alleged, that the material was indeed knowingly false, that the governmental agency relied exclusively or in large measure on false material in reaching its conclusion, and that the antitrust injury actually flowed to Pezetel from the use of the data. But these difficulties in proof are simply that, and on a motion to dismiss, the pleadings will be construed in light of what can most optimistically be inferred from them. Consequently, although the Court agrees that causation is a formidable obstacle to success on the merits of the pleading presently before the Court, it is no barrier to survival of a motion to dismiss. *See generally Antitrust Law I, supra,* ¶ 204 at 50.

16. The commentators agree with defendants' reading of *California Motor Transport*:

As compared with the legislative process, improper behavior in the adjudicatory or judicial context is more readily identified as improper and more widely regarded as reprehensible. To be sure, adjudication explicitly relies on the adversary process to develop "truth" and thus might seem to expect, and therefore to excuse, overstatements or even misstatements by a party. In fact, however, the expected standards of conduct are much higher. The Supreme Court recognized this by observing, for example, "Misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." Indeed, there are well developed and highly elaborated definitions of what is or is not proper behavior by litigating parties.

. . . There certainly is no privilege for misrepresentations to administrative agencies which base their decisions on information provided by the parties.
*Antitrust Law I, supra,* ¶ 204, at 48 (footnotes omitted).

17. In the case's present posture, no record has been made regarding the internal procedures of the Treasury Department both in general and with respect to the particular proceeding in which the misconduct is alleged to have occurred. Of course, the administrative law applicable to the proceeding involved is a question of law, inquiry into which could be made on a motion to dismiss; still, a question of fact would remain regarding the particular agency proceeding collaterally challenged here.

Finally, focusing narrowly on the language of *Noerr* defining the "sham" exception as government solicitation that is actually "nothing more than an attempt to interfere directly with the business relationships of a competitor," OMC argues that the fact that OMC was successful before the agency, in that the Treasury Department actually assessed dumping duties against Melex, takes OMC out from under any possible interpretation of the "sham" exception. Plaintiff asserts that "the absence of an antitrust violation is most obvious when the petitioner actually obtains the result he seeks . . .." *Antitrust Law I, supra,* ¶ 202b at 38. It is observed, however, that the treatise quoted above excepted from this rule those cases in which improper means to achieve particular government action have been used. *Id.* at 38 n.5.

Moreover, the cases relied upon by OMC in support of its theory that success before the agency vitiates prior wrong-doing are distinguishable on the same ground, *viz.,* that no improper or illegal conduct was involved. In *Franchise Realty Interstate Corp. v. San Francisco Local Joint Executive Board, supra,* at 1079, the allegations were simply that the conspirators' opposition before the Board was "sham" and "frivolous." Moreover, in light of the state agency's relatively political nature, "the relatively precise legal standards in light of which certain arguments may be characterized as 'frivolous' are simply absent from the rough and tumble of the political arena." *Id.* As Outboard Marine well realizes, the action of the Treasury Department in assessing dumping duties against an importer is no more "political" than any adjudicatory (i. e., fact-finding) proceeding. Similarly, in *Central Bank of Clayton v. Clayton Bank, supra,* the allegations were nothing more than that the conspirators had propounded "sham and spurious" argu-

ments to a state banking commissioner and bank board in opposition to plaintiff's application for a charter. The district court in *Central Bank,* while it interpreted *California Motor Transport* as including perjury within the sham exception held that "sham and spurious" were insufficient to state such a claim.[18] 424 F.Supp. at 167. Here, while concededly scant, the allegation concerns knowingly false statements before a particular adjudicatory body. In short, neither *California Motor Transport's* language that perjury is not condoned in the administrative context nor the other authorities reviewed above support plaintiff's position that the fact of success before a governmental agency can excuse improper conduct. Accordingly, that argument is rejected.[19]

In summary, it is held that ¶ 17 of the Counterclaim, alleging a conspiracy to submit knowingly false information to the Treasury Department and the United States Custom Service, is sufficient to state a claim under § 1 of the Sherman Act.

B. *OTHER SHERMAN ACT § 1 CLAIMS*

Paragraphs 18 and 19 of the Counterclaim allege in their entirety:

18. In furtherance of the conspiracy and combination described in ¶ 16, OMC combined and conspired with other American manufacturers, including AMF and Johns-Manville, with the aid of common counsel and public relations counsel, to engage in a joint program of threatened litigation and publicity in order calculatedly to foment false impressions and fears among prospective Melex distributors as to the nature of Melex's competition, in order to discourage such distributors from selling Melex golf carts.

19. On information and belief, OMC, alone and in combination and conspiracy

18. *See* notes 3–5 *supra* and accompanying text.

19. As the discussion regarding "sham" litigation demonstrated, OMC's avoidance of dismissal of its federal-court claim here weighed heavily in favor of dismissal of Pezetel-Melex's charge that virtually identical federal-court complaints were harassing. The apparent inconsistency in these two positions is explained by the allegation that knowingly false information was considered by the Treasury Department, a charge which, if proven, would undermine the validity of any agency action taken in reliance upon the information.

with other manufacturers, falsely conveyed to potential customers of Melex golf carts that Melex was about to go out of business.

As earlier observed, ¶ 17, if interpreted to allege empty and harassing threats of litigation, is outside the scope of the Noerr-Pennington immunity. Presumably, if OMC possessed no intent to resort to the courts, then the crucial connection between the conduct and the First Amendment is lacking, and neither the tort of business disparagement nor publicity campaigns generally implicates the First Amendment, at least under these circumstances. Unfortunately, neither side had adduced any case authority for its position that publicity campaigns and disparagement of rivals are or are not actionable under Sherman Act § 1, and the Court is left primarily with the remarks of the treatise-writers, which of course arise in a vacuum.

Although the Court would be unimpressed with the sufficiency of these claims, as they are alleged, under the Sherman Act if they stood alone, the focus of the inquiry shifts dramatically when they are viewed in light of the charge, which now must be accepted as true, that OMC conspired to submit false information to a government agency. If the latter claim is taken at face value, then Pezetel-Melex's assertions of unfair competition and business disparagement arise in the context of a counterclaim charging a concerted campaign that has at its center an antitrust violation. It is evident that such actions, even if taken in concert, however, must be subject to a de minimus rule, if the antitrust courts are not to become the battleground for a variety of intentional-tort suits. Whether such a de minimus rule could ever be enforced against

an antitrust plaintiff at the pleading stage need not be faced by this Court, since the presence of a well-pleaded Sherman § 1 claim in ¶ 17 removes the allegations from the area in which any de minimus rule could legitimately operate. For example, in *Control Data Corp. v. International Business Machines Corp., supra,* at 848–49, an allegation that IBM "wrongfully and deceptively developed, fostered an maintained a viewpoint among computer users . . . that computer software is an intangible without [market] value" survived a motion to dismiss. As here, that charge was accompanied by a serious allegation of agency misconduct, fraud in the United States Patent Office. Consequently, if OMC combined with others to take action violative of the antitrust laws, then other courses of action against identical competitors for identical anticompetitive goals might be actionable.[20]

Having so concluded, however, it is emphasized that charges of unfair competition, such as those alleged in ¶ ¶ 18 and 19 of the Counterclaim, could only result in antitrust liability—irrespective of whether defendants ultimately succeed in their proof of the agency misconduct allegation—when the conduct is systematic, wide-ranging and has a clearly discernible market effect.[21] Isolated instances of unethical business practices do not rise to the level of Sherman Act § 1 liability.

■ In the case of the business disparagement of Pezetel-Melex's product to customers by OMC and its conspirators, a pervasive and systematic campaign must be proven, and the elements of a demonstrated violation must include "cumulative proof that the representations [to buyers] were

---

**20.** It is emphasized, however, that this holding is perfectly in accord with the position of Areeda and Turner, much pressed by Outboard Marine, that unfair competition of the sort alleged by the Counterclaim should generally be ignored in the antitrust forum. *Antitrust Law III, supra,* ¶ 737, at 278. First, as defendants argue, the suggestion of the authors that business disparagement of rivals should "presumptively be ignored," necessarily contemplates that the charge survive a motion to dismiss. Otherwise, the result would be to completely exclude such charges from the antitrust realm. Second, to permit the defendants to proceed with the claim does not relieve them of a formidable burden of proof.

**21.** Of course, if defendants did prevail on their claim that OMC submitted knowingly false information to the Treasury, then some overlap in the market effect (i. e., damages) flowing from the two courses of conduct would probably exist.

clearly false, clearly material, clearly likely to induce reasonable reliance, made to buyers without knowledge of the subject matter, continued for prolonged periods, and not readily susceptible of neutralization or other offset" by Pezetel-Melex. *Antitrust Law III,* § 738a, at 279.

As for ¶ 18, in which the "joint program of threatened litigation and publicity" is alleged, the defendants must demonstrate (1) the presence of a systematic conspiracy; (2) the coercive goal as charged; (3) clearly false representations in a pattern arising above isolated incidents; (4) upon which prospective distributors might reasonably rely; (5) that these would-be distributors did so rely; and (6) that Pezetel-Melex suffered clearly identifiable market injury therefrom.

## II. *CHARGES UNDER THE WILSON TARIFF ACT*

Incorporating all the factual allegations of the complaint, the defendants assert that Outboard Marine's practices violated the Wilson Tariff Act, 15 U.S.C. § 8, which provides in pertinent part:

Every combination, conspiracy, trust, agreement, or contract is declared to be contrary to public policy, illegal, and void when the same is made by or between two or more persons or corporations, either of whom, as agent or principal, is engaged in importing any article from any foreign country into the United States, and when such combination, conspiracy, trust, agreement, or contract is intended to operate in restraint of lawful trade, or free competition in lawful trade or commerce, or to increase the market price in any part of the United States of any article or articles imported or intended to be imported into the United States, or of any manufacture into which such imported article enters or is intended to enter.

*Id.* § 8. Pezetel-Melex did not mention this count of the Counterclaim either in its brief or its oral argument. Plaintiff urges, however, that the Act only applies to combinations "by or between two or more persons

or corporations, either of whom . . . is engaged in importing any article . . into the United States." Pezetel-Melex have not alleged either that OMC is an importer or that the conspiracy involves any other importer of goods. It is concluded that the Counterclaim fails to allege conduct falling within the scope of the Wilson Tariff Act and the latter will be dismissed.

An order will be entered in conformity with this Opinion.